[No. S111780. July 22, 2004.]

In re GEORGE T., a Person Coming Under the Juvenile Court Law;
THE PEOPLE, Plaintiff and Respondent, v.
GEORGE T., Defendant and Appellant.

Counsel

Michael A. Kresser, under appointment by the Supreme Court, for Defendant and Appellant.

Marsha Levick, Suzanne Meiners; Abigail Trillin and Sarah Colby for Legal Services for Children, Juvenile Law Center, National Center for Youth Law and Legal Advocates for Children and Youth as Amici Curiae on behalf of Defendant and Appellant.

Susan L. Burrell for Youth Law Center as Amicus Curiae on behalf of Defendant and Appellant.

David Greene; Ann Brick; Robert M. O'Neil, Joshua Wheeler; Michael Murphy; Rohde & Victoroff, Stephen F. Rohde; Joseph, Lichtenstein & Levinson, Burton Joseph; and Joan L. Bertin for J. M. Coetzee, Michael Chabon, Peter Straub, Harlan Ellison, George Garrett, Ayelet Waldman, Neil Gaiman, Jayne Lyn Stahl, Michael Rothenberg, Julia Stein, Greg Rucka, Floyd Salas, American Civil Liberties Union of Northern California, Feminists for Free Expression, First Amendment Project, Comic Book Legal Defense Fund, National Coalition Against Censorship, PEN American Center and PEN USA as Amici Curiae on behalf of Defendant and Appellant.

Bill Lockyer, Attorney General, Manuel M. Medeiros, State Solicitor General, Robert R. Anderson, Chief Assistant Attorney General, Ronald A. Bass and Gerald A. Engler, Assistant Attorneys General, Stan M. Helfman, Violet M. Lee and Jeffrey M. Laurence, Deputy Attorneys General, for Plaintiff and Respondent.

Opinion

**MORENO, J.**—We consider in this case whether a high school student made a criminal threat by giving two classmates a poem labeled "Dark Poetry," which recites in part, "I am Dark, Destructive, & Dangerous. I slap on my face of happiness but inside I am evil!! For I can be the next kid to bring guns to kill students at school. So parents watch your children cuz I'm BACK!!" For the reasons below, we conclude that the ambiguous nature of the poem, along with the circumstances surrounding its dissemination, fail to establish that the poem constituted a criminal threat.

I. Facts and Procedural History

Fifteen-year-old George T. (minor) had been a student at Santa Teresa High School in Santa Clara County for approximately two weeks when on Friday,

March 16, 2001, toward the end of his honors English class, he approached fellow student Mary S. and asked her, "Is there a poetry class here?" Minor then handed Mary three sheets of paper and told her, "[r]ead these." Mary did so. The first sheet of paper contained a note stating, "These poems describe me and my feelings. Tell me if they describe you and your feelings." The two other sheets of paper contained poems. Mary read only one of the poems, which was labeled "Dark Poetry" and entitled "Faces":

> Who are these faces around me?
> Where did they come from?
> They would probably become the
> next doctors or loirs or something. All
> really intelligent and ahead in their
> game. I wish I had a choice on
> what I want to be like they do.
> All so happy and vagrant. Each
> origonal in their own way. They
> make me want to puke. For I am
> Dark, Destructive, & Dangerous. I
> slap on my face of happiness but
> inside I am evil!! For I can be
> the next kid to bring guns to
> kill students at school. So parents
> watch your children cuz I'm BACK!!
> by: Julius AKA Angel[1]

Minor had a "straight face," not "show[ing] any emotion, neither happy or sad or angry or upset," when he handed the poems to Mary.

Upon reading the "Faces" poem, Mary became frightened, handed the poems back to minor, and immediately left the campus in fear. After she informed her parents about the poem, her father called the school, but it was closed. Mary testified she did not know minor well, but they were on "friendly terms." When asked why she felt minor gave her the poem to read, she responded: "I thought maybe because the first day he came into our class, I approached him because that's the right thing to do" and because she continued to be nice to him.

After Mary handed the poems back to minor, minor approached Erin S. and Natalie P., students minor had met during his two weeks at Santa Teresa High School. Erin had been introduced to minor a week prior and had subsequently spoken with him on only three or four occasions, whereas

---

[1] Minor went by the name "Julius"; misspelled words are in original.

Natalie considered herself minor's friend and had come to know him well during their long after-school conversations, which generally lasted between an hour to an hour and a half and included discussions of poetry. Minor handed Erin a "folded up" piece of paper and asked her to read it. He also handed a similarly folded piece of paper to Natalie, who was standing with Erin. Because Erin was late for class, she only pretended to read the poem to be polite, but did not actually read it. She placed the unread poem in the pocket of her jacket.

The next day, Saturday, Mary e-mailed her English teacher William Rasmussen to report her encounter with minor.[2] She wrote: "I'm sorry to bother you over the weekend, but I don't think this should wait until Monday. During 6th period on Friday, 3/16, the guy in our class called julius (actually his name is Theodore?) gave me two poems to read. He explained to me that these poems 'described him and his feelings,' and asked if I 'felt the same way.' [¶] I was surprised to find that the poems were about how he is 'nice on the outside,' and how he's 'going to be the next person to bring a gun to school and kill random people.' I told him to bring the poems to room 315 to Ms. Gonzalez because [she] is in charge of poetry club. He said he would but I don't know for sure if he did." Mary remained in fear throughout the weekend because she understood the poem to be personally threatening to her, as a student. Asked why she felt the poem was a threat, Mary responded: "It's obvious he thought of himself as a dark, destructive, and dangerous person. And if he was willing to admit that about himself and then also state that he could be the next person to bring guns and kill students, then I'd say that he was threatening." She understood the term "dark poetry" to mean "angry threats; any thoughts that aren't positive."

Rasmussen called Mary on Sunday regarding her e-mail. Mary sounded very shaken during the conversation, and based on this and on what she stated about the contents of the poem, Rasmussen contacted the school principal and the police. He read "Faces" for the first time during the jurisdictional hearing and, upon reading it, felt personally threatened by it because, according to Rasmussen, "He's saying he's going to come randomly shoot." His understanding of "dark poetry" was that it entailed "the concept of death and causing and inflicting a major bodily pain and suffering . . . . There is something foreboding about it."

On Sunday, March 18, officers from the San Jose Police Department went to minor's uncle's house, where minor and his father were residing. An officer asked minor, who opened the door when the officers arrived, whether there were any guns in the house. Minor "nodded." Minor's uncle was

---

[2] Rasmussen had been absent from school on Friday, and a substitute teacher was instructing the English class when minor asked Mary to read his poems.

surprised that minor was aware of his guns, and handed the officers a .38-caliber handgun and a rifle. When asked about the poems disseminated at school, minor handed an officer a piece of paper he took from his pocket. The paper contained a poem entitled, "Faces in My Head" which recited:

> Look at all these faces around me.
> > They look so vagrant.
> They have their whole lives ahead of them.
> > They have their own indivisaulity.
> Those kind of people make me wanna puke.
> > For I am a slave to very evil masters.
> I have no future that I choose for myself.
> > I feel as if I am going to go crazy.
> Probably I would be the next high school killer.
> > A little song keeps playing in my head.
> My daddy is worth a dollar not even 100 cents.
> > As I look at these faces around me
> I wonder why r they so happy.
> > What do they have that I don't.
> Am I the only one with the messed up mind.
> > Then I realize, I'm cursed!!

As with the poem entitled "Faces," this poem was labeled "dark poetry" but it was not shown or given to anyone at school. Minor drafted "Faces in My Head" that morning in an attempt to capture what he had written in "Faces" because he wanted a copy for his poetry collection. Minor was taken into custody.

Police officers went to the school the following Monday to investigate the dissemination of the poem. Erin was summoned to the vice-principal's office and asked whether minor had given her any notes. She responded in the affirmative, realized that the poem was still in the pocket of her jacket, and retrieved it. The paper contained a poem entitled "Faces," which was the same poem given to Mary. Upon reading the poem for the first time in the vice-principal's office, Erin became terrified and broke down in tears, finding the poem to be a personal threat to her life. She testified that she was not in the poetry club and had no interest in the subject.

Natalie, who testified on behalf of minor, recalled that minor said, "[r]ead this" as he handed her and Erin the pieces of paper. The folded-up sheet of paper Natalie received contained a poem entitled, "Who Am I." When a police officer went to Natalie's home to inquire about the poem minor had given her on Friday, Natalie was not completely cooperative and truthful,

telling the officer that the poem was about water and dolphins and that she believed it was a love poem. The police retrieved the poem from Natalie's trash can and although it was torn, some of it could still be deciphered: ". . . I created? . . . cause it really . . . feel as if . . . stolen from . . . of peace . . . Taken to a place that you hate. Your locked up and when your let out of your cage it is to perform. Not able to be yourself and always hiding & thinking would people like me if I behaved differently? by Julius AKA Angel."

Natalie did not feel threatened by the poem, rather it made her "feel sad" because "[i]t was kind of lonely." She testified that "dark poetry is . . . relevant to like pure emotions, like sadness, loneliness, hate or just like pure emotions. Sometimes it tells a story, like a dark story." Based on her extended conversations with minor, Natalie found him to be "mild and calm and very serene" and did not consider him to be violent.

Minor testified the poem "Faces" was not intended to be a threat and, because Erin and Natalie were his friends, he did not think they would have taken his poems as such. He thought of poetry as art and stated that he was very much interested in the subject, particularly as a medium to describe "emotions instead of acting them out." He wrote "Faces" during his honors English class on the day he showed it to Mary and Erin. Minor was having a bad day as a consequence of having forgotten to ask his parents for lunch money and having to forgo lunch that day, and because he was unable to locate something in his backpack. He had many thoughts going through his head, so he decided to write them down as a way of getting them out. The poem "Who Am I," which was given to Natalie, was written the same day as "Faces," but was written during the lunch period. Neither poem was intended to be a threat. Instead they were "just creativity."

Minor and his friends frequently joked about the school shootings at Columbine in Colorado.[3] They would jokingly say, "I'm going to be the next Columbine kid." Minor testified that Natalie and Erin had been present when he and some of his friends had joked about Columbine, with someone stating that "I'll probably be the next Columbine killer," and indicating who would be killed and who would be spared. Given this past history, minor believed Natalie and Erin would understand the poems as jokes.

The poems were labeled "dark poetry" to inform readers that they were exactly that and, minor testified, "if anybody was supposed to read this poem, or let's say if my mom ever found my poem or something of that nature, I would like them to know that it was dark poetry. Dark poetry is usually just

---

[3] This reference is to the 1999 school shooting at Columbine High School in Colorado involving two student shooters that resulted in the death of 12 fellow students and one faculty member. (See *Fleming v. Jefferson County School District R-1* (10th Cir. 2002) 298 F.3d 918.)

an expression. It's creativity. It is not like you're actually going to do something like that, basically."

Asked why he wrote, "For I can be the next kid to bring guns to school and kill students," minor responded: "The San Diego killing[4] was about right around this time. So since I put the three Ds—dark, destructive, and dangerous—and since I said—'I am evil,' and since I was talking about people around me—faces—how I said, like, how they would make me want to—did I say that?—well, even if I didn't—yeah, I did say that. Okay. So, um, I said from all these things, it sounds like, for I can be the next Columbine kid, basically. So why not add that in? And so, 'Parents, watch your children, because I'm back,' um, I just wanted to—kind of like a dangerous ending, like a—um, just like ending a poem that would kind of get you, like,—like, whoa, that's really something."

Minor stated that he did not know Mary and did not give her any poems. However, he was unable to explain how Mary was able to recount the contents of the "Faces" poem.

On cross-examination, minor conceded that he had had difficulties in his two previous schools, including being disciplined for urinating on a wall at his first school and had been asked to leave his second school for plagiarizing from the Internet. He explained that the urination incident was caused by a doctor-verified bladder problem. He denied having any ill will toward the school district, but conceded when pressed by the prosecutor that he felt the schools "had it in for me."

An amended petition under Welfare and Institutions Code section 602 was filed against minor, alleging minor made three criminal threats in violation of Penal Code section 422.[5] The victims of the alleged threats were Mary (count 1), Erin (count 3), and Rasmussen (count 2).

Following a contested jurisdictional hearing, the juvenile court found true the allegations with respect to Mary and Erin, but dismissed the allegation with respect to Rasmussen. At the dispositional hearing, the court adjudicated minor a ward of the court and ordered a 100-day commitment in juvenile hall. Minor appealed, challenging the sufficiency of the evidence to support the juvenile court's finding that he made criminal threats. Over a dissent, the Court of Appeal affirmed the juvenile court in all respects with the exception

---

[4] On March 5, 2001, a student at Santana High School in Santee, California, shot and killed two students and wounded 13 others. (See Angel, *The School Shooters: Surprise! Boys Are Far More Violent Than Girls and Gender Stereotypes Underlie School Violence* (2001) 27 Ohio N.U. L.Rev. 485, 490–491.)

[5] All further statutory references are to the Penal Code unless otherwise indicated.

of remanding the matter for the sole purpose of having that court declare the offenses to be either felonies or misdemeanors. We granted review and now reverse.

## II. DISCUSSION

■ In *People v. Toledo* (2001) 26 Cal.4th 221 [109 Cal.Rptr.2d 315, 26 P.3d 1051] (*Toledo*), we made clear that not all threats are criminal and enumerated the elements necessary to prove the offense of making criminal threats under section 422. The prosecution must prove "(1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat—which may be 'made verbally, in writing, or by means of an electronic communication device'—was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances." (*Toledo, supra,* 26 Cal.4th at pp. 227–228, citing *People v. Bolin* (1998) 18 Cal.4th 297, 337–340, & fn. 13 [75 Cal.Rptr.2d 412, 956 P.2d 374].)[6]

Minor challenges the juvenile court's findings that he made criminal threats in violation of section 422 and contends that his First Amendment rights were infringed by the court's conclusion that his poem was a criminal threat.

We address first the threshold issue of what standard of review applies in this case. Claims challenging the sufficiency of the evidence to uphold a judgment are generally reviewed under the substantial evidence standard. Under that standard, " 'an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find [the elements of the crime] beyond a

---

[6] Section 422 provides in relevant part: "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally [or] in writing . . . is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it was made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety . . . , shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison."

reasonable doubt.' " (*People v. Bolden* (2002) 29 Cal.4th 515, 553 [127 Cal.Rptr.2d 802, 58 P.3d 931], quoting *People v. Kipp* (2001) 26 Cal.4th 1100, 1128 [113 Cal.Rptr.2d 27, 33 P.3d 450]; see *Jackson v. Virginia* (1979) 443 U.S. 307, 317–320 [61 L.Ed.2d 560, 99 S.Ct. 2781].) " ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment." ' " (*People v. Bean* (1988) 46 Cal.3d 919, 933 [251 Cal.Rptr. 467, 760 P.2d 996], quoting *People v. Hillery* (1965) 62 Cal.2d 692, 702 [44 Cal.Rptr. 30, 401 P.2d 382].)

Minor and his supporting amici curiae[7] contend that because First Amendment interests are implicated by the determination that minor's poem constituted a threat, this court should employ the independent review standard, which entails an examination of the " ' "statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the First Amendment . . . protect." ' " (*Harte-Hanks Communications, Inc. v. Connaughton* (1989) 491 U.S. 657, 688–689 [105 L.Ed.2d 562, 109 S.Ct. 2678] (*Harte-Hanks*), quoting *New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 285 [11 L.Ed.2d 686, 84 S.Ct. 710]; see also *Bose Corp. v. Consumers Union of U.S., Inc.* (1984) 466 U.S. 485 [80 L.Ed.2d 502, 104 S.Ct. 1949] (*Bose*).) Disagreeing, the Attorney General contends this court should not depart from the substantial evidence standard because the high court decisions cited by minor are inapposite, and this court has already determined that section 422 is constitutional.

In *Bose*, the Supreme Court explained "that in cases raising First Amendment issues [it has] *repeatedly* held that an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.' " (*Bose, supra*, 466 U.S. at p. 499, italics added, quoting *New York Times Co. v. Sullivan, supra*, 376 U.S. at pp. 284–286.) *Bose* held that a federal appellate court should conduct an independent review of a trier of fact's determination that a defendant acted with "actual malice" in the context of a defamation suit, rather than rely on the clearly-erroneous standard typically applied to findings of fact. (*Bose, supra*, 466 U.S. at p. 514.)

Independent review, which "assigns to judges a constitutional responsibility that cannot be delegated to the trier of fact, whether the factfinding function

---

[7] J.M. Coetzee, Michael Chabon, Peter Straub, Harlan Ellison, George Garrett, Ayelet Waldman, Neil Gaiman, Jayne Lyn Stahl, Michael Rothenberg, Julia Stein, Greg Rucka, Floyd Salas, the American Civil Liberties Union of Northern California, Feminists for Free Expression, the Comic Book Legal Defense Fund, the First Amendment Project, the National Coalition Against Censorship, PEN American Center and PEN USA, and Youth Law Center.

be performed in the particular case by a jury or by a trial judge" (*Bose, supra,* 466 U.S. at p. 501 [104 S.Ct. 1949]), "is a rule of federal constitutional law" (*id.* at p. 510). It is necessary "because the reaches of the First Amendment are ultimately defined by facts it is held to embrace" and an appellate court must decide "whether a given course of conduct falls on the near or far side of the line of constitutional protection." (*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.* (1995) 515 U.S. 557, 567 [132 L.Ed.2d 487, 115 S.Ct. 2338], citing *Bose, supra,* 466 U.S at p. 503.)

We conclude that a reviewing court should make an independent examination of the record in a section 422 case when a defendant raises a plausible First Amendment defense to ensure that a speaker's free speech rights have not been infringed by a trier of fact's determination that the communication at issue constitutes a criminal threat. (*Bose, supra,* 466 U.S. 485.) Contrary to the Attorney General's contention, neither *Bose* nor *Harte-Hanks,* nor any other high court decision, limits independent review to specific First Amendment contexts. Rather, both *Bose* and *Harte-Hanks* emphasize that the high court has engaged in independent review in various First Amendment contexts, including "fighting words" (*Street v. New York* (1969) 394 U.S. 576 [22 L.Ed.2d 572, 89 S.Ct. 1354]), "obscenity" (*Jenkins v. Georgia* (1974) 418 U.S. 153 [41 L.Ed.2d 642, 94 S.Ct. 2750]; *Miller v. California* (1973) 413 U.S. 15 [37 L.Ed.2d 419, 93 S.Ct. 2607]), "inciting imminent lawless action" (*Hess v. Indiana* (1973) 414 U.S. 105 [38 L.Ed.2d 303, 94 S.Ct. 326]), "peaceful assembly" (*Edwards v. South Carolina* (1963) 372 U.S. 229 [9 L.Ed.2d 697, 83 S.Ct. 680]), "clear and present danger to integrity of court" (*Pennekamp v. Florida* (1946) 328 U.S. 331 [90 L.Ed. 1295, 66 S.Ct. 1029]), and "failure to issue license for religious meeting in public park" (*Niemotko v. Maryland* (1951) 340 U.S. 268 [95 L.Ed. 267, 71 S.Ct. 325]). (*Harte-Hanks, supra,* 491 U.S. at pp. 685–686, fn. 33; *Bose, supra,* 466 U.S. at pp. 505–508.) More recently, the high court applied the independent review standard in deciding whether a parade constituted protected speech (*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc., supra,* 515 U.S. 557) and whether a group "engage[d] in 'expressive association' " (*Boy Scouts of America v. Dale* (2000) 530 U.S. 640, 648 [147 L.Ed.2d 554, 120 S.Ct. 2446]). The high court did so without reference to the unique nature of the specific First Amendment question involved. What is evident is that the high court has employed the independent review standard in varied First Amendment contexts as an added safeguard against infringement of First Amendment rights.[8]

---

[8] Amici curiae J.M. Coetzee et al. further find support for this less deferential standard in this court's recent decision in *DVD Copy Control Assn. v. Bunner* (2003) 31 Cal.4th 864, 889–890 [4 Cal.Rptr.3d 69, 75 P.3d 1], in which we offered the lower court guidance on the proper standard of review for determining whether evidence supported the issuance of a preliminary injunction under this state's trade secret law. We explained, " '[W]here a [f]ederal

■ The Attorney General contends independent review is unnecessary because true threats comprise a category of speech that is unprotected by the First Amendment (*Virginia v. Black* (2003) 538 U.S. 343 [155 L.Ed.2d 535, 123 S.Ct. 1536]; *Watts v. United States* (1969) 394 U.S. 705 [22 L.Ed.2d 664, 89 S.Ct. 1399]), and argues that a fact finder's determination that section 422 has been violated necessarily includes a finding that the speech at issue is an unprotected true threat. This misses the point—independent review is utilized by a reviewing court precisely to make certain that what the government characterizes as speech falling within an unprotected class actually does so. (*Bose, supra,* 466 U.S. at 505 [independent review is employed "both to be sure that the speech in question actually falls within the unprotected category and to confine the perimeters of any unprotected category within acceptably narrow limits in an effort to ensure that protected expression will not be inhibited"].)

Moreover, as the *Bose* court explained in the obscenity context, "although under *Miller v. California* [(1973) 413 U.S. 15 [37 L.Ed.2d 419, 93 S.Ct. 2607]], the question of what appeals to 'prurient interest' and what is 'patently offensive' under the community standard obscenity test are *'essentially questions of fact,'* [citation], we expressly recognized the 'ultimate power of appellate courts to conduct an independent review of constitutional claims when necessary,' [citation]. We have therefore rejected the contention that a jury finding of obscenity *vel non* is insulated from review so long as the jury was properly instructed and there is some evidence to support its findings, holding that substantive constitutional limitations govern." (*Bose, supra,* 466 U.S. at pp. 506–507, italics added, fn. omitted.)

■ While it is certainly true, as the Attorney General contends, that a threat falling within section 422 lies outside the bounds of First Amendment protection, it is untrue that that fact militates against conducting an independent review. As we explained in *Toledo, supra,* 26 Cal.4th 221, the current version of section 422 was enacted by the Legislature after this court held the prior version unconstitutionally vague under the California Constitution in *People v. Mirmirani* (1981) 30 Cal.3d 375 [178 Cal.Rptr. 792, 636 P.2d 1130]. (*Toledo, supra,* 26 Cal.4th at p. 228.) The current version of section 422 was drafted with the mandates of the First Amendment in mind, incorporating language from a federal appellate court true-threat decision, "to describe and limit the type of threat covered by the statute." (*Toledo,* at p. 229, citing *United States v. Kelner* (2d Cir. 1976) 534 F.2d 1020, 1027.) While *Toledo* has explained the nature of our review by enumerating the

---

right has been denied as the result of a [factual] finding . . . or where a conclusion of law as to a [f]ederal right and a finding of fact are so intermingled as to make it necessary, in order to pass upon the [f]ederal question, to analyze the facts,' the reviewing court must independently review these findings."

necessary elements for a criminal threats prosecution, independent review permits an appellate court to ensure that the *Toledo* test is satisfied and that the suppression of speech is constitutionally permissible.

■ In sum, the high court has applied independent review in a wide array of First Amendment contexts, and no compelling reasons exist why independent review should not also apply in the unique circumstances presented in this case. Independent review is particularly important in the threats context because it is a type of speech that is subject to categorical exclusion from First Amendment protection, similar to obscenity, fighting words, and incitement of imminent lawless action. "What is a threat must be distinguished from what is constitutionally protected speech." (*Watts v. United States, supra,* 394 U.S. at p. 707.)

■ Independent review is not the equivalent of de novo review "in which a reviewing court makes an original appraisal of all the evidence to decide whether or not it believes" the outcome should have been different. (*Bose, supra,* 466 U.S. at p. 514, fn. 31.) Because the trier of fact is in a superior position to observe the demeanor of witnesses, credibility determinations are not subject to independent review, nor are findings of fact that are not relevant to the First Amendment issue. (*Id.* at pp. 499–500; *Harte-Hanks, supra,* 491 U.S. at p. 688.) As noted above, under the substantial evidence standard, the question is whether any rational trier of fact could find the legal elements satisfied beyond a reasonable doubt, whereas under independent review, an appellate court exercises its independent judgment to determine whether the facts satisfy the rule of law. ■ Accordingly, we will defer to the juvenile court's credibility determinations, but will " ' "make an independent examination of the whole record" ' " (*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc., supra,* 515 U.S. at pp. 567–568), including a review of the constitutionally relevant facts " 'de novo, independently of any previous determinations by the [juvenile court]' " (*DVD Copy Control Assn. v. Bunner, supra,* 31 Cal.4th at pp. 889–890, quoting *McCoy v. Hearst Corp.* (1986) 42 Cal.3d 835, 842 [231 Cal.Rptr. 518, 727 P.2d 711]; *Hurley, supra,* 515 U.S. at pp. 567–568) to determine whether minor's poem was a criminal threat entitled to no First Amendment protection.

As discussed above, this court in *Toledo* enumerated five elements the prosecution must prove in order to meet its burden of proving that a criminal threat was uttered. Minor challenges the findings with respect to two of the five elements, contending that the poem "was [not] 'on its face and under the circumstances in which it [was disseminated] so unequivocal, unconditional, immediate, and specific as to convey to [Mary and Erin] a gravity of purpose and an immediate prospect of execution of the threat' " (quoting § 422) and that the facts fail to establish he harbored the specific intent to threaten Mary and Erin (see *ibid.*).

■ With respect to the requirement that a threat be "so unequivocal, unconditional, immediate, and specific as to convey to the person threatened a gravity of purpose and an immediate prospect of execution of the threat," we explained in *People v. Bolin, supra,* 18 Cal.4th 297, that the word "so" in section 422 meant that " 'unequivocality, unconditionality, immediacy and specificity are not absolutely mandated, but must be sufficiently present in the threat and surrounding circumstances . . . .' " (*Bolin, supra,* 18 Cal.4th at p. 340, quoting *People v. Stanfield* (1995) 32 Cal.App.4th 1152, 1157 [38 Cal.Rptr.2d 328].) "The four qualities are simply the factors to be considered in determining whether a threat, considered together with its surrounding circumstances, conveys those impressions to the victim." (*People v. Stanfield, supra,* 32 Cal.App.4th at pp. 1157–1158.) A communication that is ambiguous on its face may nonetheless be found to be a criminal threat if the surrounding circumstances clarify the communication's meaning. (*People v. Butler* (2000) 85 Cal.App.4th 745, 753–754 [102 Cal.Rptr.2d 269].)

With the above considerations in mind, we examine the poem at issue— "Faces." What is readily apparent is that much of the poem plainly does not constitute a threat. "Faces" begins by describing the protagonist's feelings about the "faces" that surround him: "Where did they come from? They would probably become the next doctors or loirs or something. All really intelligent and ahead in their game. I wish I had a choice on what I want to be like they do. All so happy and vagrant. Each origonal in their own way. They make me want to puke." These lines convey the protagonist's feelings about the students around him and describe his envy over how happy and intelligent they appear to be, with opportunities he does not have. There is no doubt this portion of the poem fails to convey a criminal threat as no violent conduct whatsoever is expressed or intimated. Neither do the next two lines of the poem convey a threat: "For I am Dark, Destructive, & Dangerous. I slap on my face of happiness but inside I am evil!!" These lines amount to an introspective description of the protagonist, disclosing that he is "destructive," "dangerous," and "evil." But again, such divulgence threatens no action.

Only the final two lines of the poem could arguably be construed to be a criminal threat: "For I can be the next kid to bring guns to kill students at school. So parents watch your children cuz I'm BACK!!" Mary believed this was a threat, but her testimony reveals that her conclusion rested upon a considerable amount of interpretation: "I feel that when he said, 'I can be the next person,' that he meant that he will be, because also he says that he's dark, destructive, and dangerous person. And I'd describe a dangerous person as someone who has something in mind of killing someone or multiple people." The juvenile court's finding that minor threatened to kill Mary and Erin likewise turned primarily on its interpretation of the words, "For I *can* be the next kid to bring guns to kill students at school" (italics added) to

mean not only that minor could do so, but that he would do so. In other words, the court construed the word "can" to mean "will." But that is not what the poem recites. However the poem was interpreted by Mary and Erin, and the court, the fact remains that "can" does not mean "will." While the protagonist in "Faces" declares that he has the potential or capacity to kill students given his dark and hidden feelings, he does not actually threaten to do so. While perhaps discomforting and unsettling, in this unique context this disclosure simply does not constitute an actual threat to kill or inflict harm.

As is evident, the poem "Faces" is ambiguous and plainly equivocal. It does not describe or threaten future conduct because it does not state that the protagonist plans to kill students, or even that any potential victims would include Mary or Erin. Such ambiguity aside, it appears that Mary actually misread the text of the poem. In her e-mail to Rasmussen, she stated that the poem read, "he's '*going* to be the next person to bring a gun to school and kill random people.' " (Italics added.) She did not tell Rasmussen that this was her interpretation of the poem, but asserted that those were the words used by minor. Given the student killings in Columbine and Santee, this may have been an understandable mistake, but it does not alter the requirement that the words actually used must constitute a threat in light of the surrounding circumstances.

The Court of Appeal rejected minor's contention that the protagonist in the poem was a fictional character rather than minor because he gave the poem to Mary with a note stating that the poem described "me and my feelings." There is no inconsistency, however, in viewing the protagonist as a fictional character, while also concluding that the poem reflects minor's personal feelings. And when read by another person, the poem may similarly describe that reader's feelings, as minor implied when he asked Mary if the poem also "described [her] and [her] feelings." More important, the note is consistent with the contention that the poem did nothing more than describe certain dark feelings. The note asked whether Mary had the same feelings; it did not state or imply something to the effect of, "this is what I plan to do, are you with me." (See, e.g., *In re Ryan D.* (2002) 100 Cal.App.4th 854, 864 [123 Cal.Rptr.2d 193] (*Ryan D.*) [violent painting did not unequivocally convey a threat since it was unaccompanied by statements such as "this will be you," or "I do have a gun, you know"].)

Of course, exactly what the poem means is open to varying interpretations because a poem may mean different things to different readers. As a medium of expression, a poem is inherently ambiguous. In general, "[r]easonable persons understand musical lyrics and poetic conventions as the figurative expressions which they are," which means they "are not intended to be and should not be read literally on their face, nor judged by a standard of prose

oratory." (*McCollum v. CBS, Inc.* (1988) 202 Cal.App.3d 989, 1002 [249 Cal.Rptr. 187].) Ambiguity in poetry is sometimes intended: " 'Ambiguity' itself can mean an indecision as to what you mean, an intention to mean several things, a probability that one or the other or both of two things has been meant, and the fact that a statement has several meanings." (Empson, Seven Types of Ambiguity (2d ed. 1996) pp. 5–6.) As the Court of Appeal observed in *Ryan D., supra,* 100 Cal.App.4th 854, a case involving a painting graphically depicting a student shooting a police officer in the back of the head, "a painting—even a graphically violent painting—is necessarily ambiguous because it may use symbolism, exaggeration, and make-believe." (*Ryan D., supra,* 100 Cal.App.4th at p. 859.) This observation is equally applicable to poetry since it is said that "[p]ainting is silent poetry and poetry painting that speaks." (Plutarch, De Gloria Atheniensium, III, 346, attributed to Simonides (circa 556–468 B.C.) in Bartlett, Familiar Quotations (15th ed. 1980) p. 68.)

■ In short, viewed in isolation the poem is not "so unequivocal" as to have conveyed to Mary and Erin a gravity of purpose and an immediate prospect that minor would bring guns to school and kill them. Ambiguity, however, is not necessarily sufficient to immunize the poem from being deemed a criminal threat because the surrounding circumstances may clarify facial ambiguity. (See *Toledo, supra,* 26 Cal.4th at pp. 227–228; *People v. Butler, supra,* 85 Cal.App.4th at pp. 753–754.) As section 422 makes clear, a threat must "on its face and *under the circumstances* in which it is made, [be] so unequivocal, unconditional, immediate, and specific as to convey . . . a gravity of purpose and an immediate prospect of execution of the threat." (*Id.,* italics added.) When the words are vague, context takes on added significance, but care must be taken not to diminish the requirements that the communicator have the specific intent to convey a threat and that the threat be of such a nature as to convey a gravity of purpose and immediate prospect of the threat's execution.

Unlike some cases that have turned on an examination of the surrounding circumstances given a communication's vagueness, incriminating circumstances in this case are noticeably lacking: there was no history of animosity or conflict between the students (*People v. Gaut* (2002) 95 Cal.App.4th 1425, 1431–1432 [115 Cal.Rptr.2d 924] [defendant had a history of threatening and assaulting victim]; *People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1341–1342 [69 Cal.Rptr.2d 728] [both victim and defendant were gang members and threat made following victim's testimony against defendant's brother]), no threatening gestures or mannerisms accompanied the poem (*People v. Lepolo* (1997) 55 Cal.App.4th 85, 88–89 [63 Cal.Rptr.2d 735] [defendant raised a 36-inch machete and waved it at victim while making threat]; cf. *In re Ricky T.* (2001) 87 Cal.App.4th 1132, 1138 [105 Cal.Rptr.2d 165] [threat unaccompanied by "physical show of force"]), and no conduct

suggested to Mary and Erin that there was an immediate prospect of execution of a threat to kill (*People v. Butler, supra,* 85 Cal.App.4th at pp. 749–750 [defendant and his cohorts surrounded victim and grabbed her arm]). Thus the circumstances surrounding the poem's dissemination fail to show that, as a threat, it was sufficiently unequivocal to convey to Mary and Erin an immediate prospect that minor would bring guns to school and shoot students.

The themes and feelings expressed in "Faces" are not unusual in literature: "Literature illuminates who 'we' are: the repertory of selves we harbor within, the countless feelings we experience but never express or perhaps even acknowledge, the innumerable other lives we could but do not live, all those 'inside' lives that are not shown, not included in our resumes." (Weinstein, A Scream Goes Through the House: What Literature Teaches Us About Life (2003) p. xxiii.) "Faces" was in the style of a relatively new genre of literature called "dark poetry" that amici curiae J.M. Coetzee et al. explain is an extension of the poetry of Sylvia Plath, John Berryman, Robert Lowell, and other confessional poets who depict "extraordinarily mean, ugly, violent, or harrowing experiences." (See Deutsch, Poetry Handbook (4th ed. 1973) pp. 36–37, quoting John Berryman's "Dream Songs" ["I'm scared a only one thing, which is me"].) Consistent with that genre, "Faces" invokes images of darkness, violence, discontentment, envy, and alienation. The protagonist describes his duplicitous nature—malevolent on the inside, felicitous on the outside.

For the foregoing reasons, we hold the poem entitled "Faces" and the circumstances surrounding its dissemination fail to establish that it was a criminal threat because the text of the poem, understood in light of the surrounding circumstances, was not "so unequivocal, unconditional, immediate, and specific as to convey to [the two students] a gravity of purpose and an immediate prospect of execution of the threat." (§ 422.)[9]

---

[9] Because line-drawing is inherently difficult when dealing with language and modes of expression, we decline amici curiae J.M. Coetzee et al.'s invitation to accord poems a "very strong presumption" that they are not true threats. No bright-line rule may be drawn that adequately distinguishes a poem such as the one involved in the present case (or even poems of Plath, Lowell, and Berryman) from a "poem" that conveys a threat, such as, "Roses are red. Violets are blue. I'm going to kill you, and your family too." Both types of expression are in poetic form, may be labeled "poetry," and may have a title and by-line. We believe the elements of section 422, in particular the requirements that the communicator have the specific *intent to threaten* and that the threat be "so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat," coupled with independent review, adequately protects freedom of expression, as they have done in this case.

Our conclusion that the poem was not an unequivocal threat disposes of the matter and we need not, and do not, discuss minor's contention that he did not harbor the specific intent to threaten the students, as required by section 422.

This case implicates two apparently competing interests: a school administration's interest in ensuring the safety of its students and faculty versus students' right to engage in creative expression. Following Columbine, Santee, and other notorious school shootings, there is a heightened sensitivity on school campuses to latent signs that a student may undertake to bring guns to school and embark on a shooting rampage. Such signs may include violence-laden student writings. For example, the two student killers at Columbine had written poems for their English classes containing "extremely violent imagery." (Brunner, *The Right to Write? Free Expression Rights of Pennsylvania's Creative Students After Columbine* (2003) 107 Dick. L.Rev. 891, 893, 897.) Ensuring a safe school environment and protecting freedom of expression, however, are not necessarily antagonistic goals.

Minor's reference to school shootings and his dissemination of his poem in close proximity to the Santee school shooting no doubt reasonably heightened the school's concern that minor might emulate the actions of previous school shooters. Certainly, school personnel were amply justified in taking action following Mary's e-mail and telephone conversation with her English teacher, but that is not the issue before us. We decide here only that minor's poem did not constitute a criminal threat.[10]

### III. DISPOSITION

For the foregoing reasons, we reverse the judgment of the Court of Appeal.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J. concurred.

---

[10] Amicus curiae Youth Law Center urges that allowing and even encouraging students to express their feelings teaches students to write out their feelings rather than acting them out and permits early intervention. Early intervention may involve talking to the student, either by school personnel such as a school psychologist or other professional, talking to the student's parents, and in the most egregious of situations, such as where there appears to be an imminent threat, resort to law enforcement. (Citing U.S. Dept. of Education Early Warning, Timely Response: A Guide to Safe Schools (1998).) Amici curiae Legal Services for Children, Juvenile Law Center, National Center for Youth Law, and Legal Advocates for Children and Youth similarly urge that minor should not be sanctioned for engaging in what mental health professionals recommend—expressing feelings by, inter alia, writing poetry.

**BAXTER, J.,** Concurring.—I concur in the result. To convict one of the *felony offense* of making a *criminal* threat, the prosecution must prove several technical and stringent elements. One of these is that the threat must have been, "on its face and under the circumstances in which it [was] made, . . . so *unequivocal, unconditional, immediate, and specific* as to convey to the person threatened, a gravity of purpose and an *immediate prospect of execution* of the threat." (Pen. Code, § 422, italics added.)

Applying the independent review standard proper for cases implicating First Amendment interests, I agree the evidence does not establish this specific element. The writing, in the form of a poem, that defendant handed to Mary S. and Erin S. said that the protagonist, "Julius AKA Angel," "*can* be the next kid to bring guns to kill students at school." (Italics added.) It did not say, in so many words, that defendant *presently intended* to do so. And the surrounding circumstances did not lend unconditional meaning to this conditional language.

That said, there is no question that defendant's ill-chosen words were menacing by any common understanding, both on their face and in context. The terror they elicited in Mary S., and the concern they evoked in the school authorities, were real and entirely reasonable. It is safe to say that fears arising from a raft of high school shooting rampages, including those in Colorado and Santee, California, are prevalent among American high school students, teachers, and administrators. Certainly this was so on March 16, 2001, only *eleven days* after the Santee incident had occurred. That is the day defendant selected to press his violent writing on two vulnerable and impressionable young schoolmates who hardly knew him.

Defendant admitted at trial that he intentionally combined the subject matter and the timing for maximum shock value. Indeed, he acknowledged, his words would be interpreted as threats by "kids who didn't know [he] [was] just kidding."

Under these circumstances, as the majority observe, school and law enforcement officials had every reason to worry that defendant, deeply troubled, was contemplating his own campus killing spree. The important *interest that underlies the criminal-threat law*—protection against the trauma

of verbal terrorism—was also at stake. Accordingly, the authorities were fully justified, and should be commended, insofar as they made a prompt, full, and vigorous response to the incident. They would have been remiss had they not done so. Nothing in our very narrow holding today should be construed as suggesting otherwise.