Filed 11/10/20  In re D.R. CA1/5
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| In re D.R., a Person Coming Under the Juvenile Court Law. | A156827 |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>D.R.,<br><br>    Defendant and Appellant. | (Contra Costa County Super. Ct. No. J1800850) |

Thirteen-year-old D.R. hacked into a classmate's Instagram account and posted that he was " 'going to shoot up' " his middle school the next day with his dad's gun.  The juvenile court determined D.R. appreciated the wrongfulness of his conduct (Pen. Code, § 26).[1]  The court found true allegations that D.R. made criminal threats (§ 422), and committed false personation (§ 529) and identity theft (§ 530.5).  It designated the offenses misdemeanors, declared D.R. a ward of the court, and placed him on probation with various conditions, including that he submit to drug and alcohol testing.

---

[1] Undesignated statutory references are to the Penal Code.

1

D.R. appeals.  He contends:  (1) the court's section 26 finding is not supported by substantial evidence; (2) the prosecution failed to prove he intended that the Instagram post be taken as a threat; and (3) the court erred by imposing the drug and alcohol testing condition.

We disagree and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A.

*Jurisdictional Hearing*

In the late summer of 2018, D.R.—then 13 years and four months old—was in eighth grade at a middle school in Contra Costa County.  D.R. is "very smart."  He has no trouble learning and retaining information, but he suffers from attention deficit hyperactivity disorder.  He takes medication to improve his impulse control.  D.R.'s parents taught him the difference between right and wrong, but he sometimes has difficulty stopping himself from doing things he knows are wrong.

In mid-August, an assignment in D.R.'s history class was to create a cover page for an upcoming lesson on "America[.]"  The history teacher overheard D.R. tell another student he was going to " 'draw a white kid shooting up a school.' "  The teacher notified the principal, who discussed the incident with D.R.  When the principal asked D.R. whether he made the comment, D.R. responded:  " 'did you hear me . . . did you hear it?' "

The principal told D.R. "that kind of talk [was] not appropriate," that it would "frighten" people, and that D.R. needed to "be careful" about his comments.  The principal explained that making a threat can have "serious consequences" and can scare people.  D.R. appeared to understand what the principal was saying:  that it was inappropriate to draw a picture of a school shooting.  The principal called D.R.'s parents.

That evening, D.R.'s stepmother and father talked with D.R. They told him that comments about "shooting up a school" were "inappropriate" and "reminded" D.R. that school shootings had happened. D.R. told his parents it was " 'obviously a joke.' " In response, D.R.'s stepmother told D.R. not to "make pictures like that" and not to "joke like that, that it's inappropriate, that people can take it seriously."

D.R.'s stepmother also said something to the effect of "you never, ever make jokes about shooting up a school" because "people think that it's serious," that it "could possibly happen, and it scares people." D.R. did not always understand that what he thought was funny was not "funny to other people," so his stepmother wanted to make D.R. "understand the appropriate way to interact" with his classmates. D.R.'s father said: "[Y]ou can't make comments" about school shootings "because . . . people don't know that you're joking." D.R. appeared to understand what his parents told him.

On September 16, a threat of a shooting at the nearby high school attended by D.R.'s sister caused the closure of the school. D.R. was aware the students there had gotten the day off. His stepmother described that incident: "the kids were all getting to miss school, and they were running around [town] and having fun."

The next day, D.R. logged into a classmate's Instagram account without permission and posted the following message: "I am going to shoot up [the school] tmr with my dads gun @ 6th Period." When the classmate discovered what happened, his family called the police, who notified the principal. The principal took the threat seriously: she contacted the district superintendent, notified parents and staff a threat had been made, and asked additional police officers to patrol the campus the following day.

When D.R.'s parents received the threat notification, they talked with

3

D.R. about the importance of not "doing something like this." But rather than admitting he had posted the threat, D.R. said: "wow, I wonder if they already got him in custody." About a third of the middle school's students did not go to school the next day.

D.R. did go to school. As he approached the entrance, he motioned like "he had something in his waistband." The police searched him in the principal's office. The search revealed no weapons, but D.R. was arrested after an investigator determined he had accessed the classmate's Instagram account without permission. When police told D.R. he had been arrested for threatening the school, D.R. denied generating the Instagram post; he claimed he took a screenshot of the original post and re-posted it.

B.

*Jurisdictional Findings*

The court found by clear and convincing evidence D.R. "knew what he was doing was wrong" under section 26. It acknowledged D.R. "may have impulse control issues" but concluded his "inability to control his impulses doesn't mean that he doesn't know they're wrong." The court noted the principal told D.R. that joking about a school shooting was "not appropriate. And [D.R.] appeared to understand, and his parents taught him the difference between right and wrong. . . . [H]e does not have a memory problem. . . . He's smart. . . . [H]e was specifically told not to make jokes about shooting up a school, and he appeared to understand."

As the court explained, the fact that D.R. could not "resist doesn't mean that he didn't know it was the wrong thing to do." The court also noted D.R.'s age and experience supported the section 26 finding. D.R. was "close to 14 years old," and when confronted with the comment about the drawing, "he didn't deny . . . that it was wrong. He said, you didn't hear me say

4

that. . . . That's a guilty conscience. That's somebody trying to absolve themselves of responsibility."

Next, the court found the allegations true beyond a reasonable doubt. As relevant here, the court determined D.R. had the specific intent that the Instagram post "be taken as a threat, and it was unequivocal, unconditional, immediate and specific. It said when. It said where. It said how. And it was immediate[:] the next day. We know there was an immediate prospect of execution. That's what was communicated. And it did in fact cause students to not show up at school. So we know that it did cause people reasonably to be in fear [for] their own safety."

## C.

### *Disposition*

The court designated the offenses misdemeanors, declared D.R. a ward of the court, and placed him on probation. Probation recommended requiring D.R. to submit to drug and alcohol testing. The probation report noted D.R. had smoked marijuana "for a couple months" when he was 12. D.R.'s parents voiced support for drug testing. Defense counsel, however, objected to the condition on the grounds it lacked a "reasonable relationship to the underlying offense."

The court ordered D.R. to submit to drug and alcohol testing as a condition of probation. It explained D.R. needed support "with knowing what's appropriate," and that "making sure that he understands that he can't use any drugs or alcohol and he's subject to testing will help" him understand "where the lines are."

# DISCUSSION

## I.

### *Substantial Evidence Supports the Section 26 Finding*

D.R. challenges the sufficiency of the evidence supporting the court's finding that he appreciated the wrongfulness of his conduct under section 26.

#### A. General Principles

"[S]ection 26, which applies in juvenile wardship proceedings, creates a presumption that a child under the age of 14 is incapable of committing a crime. [Citation.] To overcome this presumption, the prosecution must show by clear and convincing evidence that the child understood the wrongfulness of the charged act at the time of its commission. [Citations.] . . . [S]ection 26 'embodies a venerable truth . . . that a young child cannot be held to the same standard of criminal responsibility as his . . . more experienced elders.' " (*In re J.E.* (2020) 54 Cal.App.5th 309, 313 (*J.E.*).)

"On appeal, we review the juvenile court's ruling under . . . section 26 to determine if it is supported by substantial evidence. [Citation.] Substantial evidence is 'evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could have made the requisite finding under the governing standard of proof.' [Citation.] Under this standard 'we review the record in the light most favorable to the court's determinations and draw all reasonable inferences from the evidence to support the findings and orders.' [Citation.] 'We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.' [Citation.] '[T]he trial court's ruling must be upheld if there is any basis in the record to sustain it.' " (*J.E., supra,* 54 Cal.App.5th at pp. 313–314.)

"Courts consider the age, experience, knowledge and conduct of a minor to determine whether [he] understood the wrongfulness of [his] conduct. [Citation.]  Knowledge of wrongfulness cannot be inferred from the offense itself, but the court may consider 'the attendant circumstances of the crime, such as its preparation, the particular method of its commission, and its concealment.'  [Citation.]  The closer a child is to the age of 14, the more likely [he] is to appreciate the wrongfulness of [his] conduct." (*J.E., supra,* 54 Cal.App.5th at p. 314.)

> ### B.  Substantial Evidence Supports the Determination that D.R. Knew His Conduct Was Wrongful

Applying these principles, we conclude the court's section 26 finding is supported by substantial evidence.  D.R. was 13 years and four months old when he threatened to " 'shoot up' " his school.  The closer the child is to age 14, " 'the more likely it is that [he] appreciates the wrongfulness of [his] acts.' " (*People v. Lewis* (2001) 26 Cal.4th 334, 378.)  Courts have upheld section 26 findings for children the same age—or younger—than D.R.  (*In re Paul C.* (1990) 221 Cal.App.3d 43, 53 [13 years and 4 months]; *In re Jerry M.* (1997) 59 Cal.App.4th 289, 298 [11 years and 2 months].)

D.R.'s knowledge and experience support the court's conclusion that he appreciated the wrongfulness of his conduct.  D.R. is "very smart" and has no difficulty learning or retaining information.  He has an impulse control issue, but he does not suffer from a "diminished . . . mental capacity for [his] age." (*J.E., supra,* 54 Cal.App.5th at p. 314.)  D.R.'s parents taught him the difference between right and wrong.  They also told D.R. it was never appropriate to joke about a school shooting, and they explained why:  because it would scare people.  The school principal communicated similar information.  D.R. appeared to understand what these three adults told him.

7

(*In re Jerry M., supra,* 59 Cal.App.4th at p. 298 [upholding section 26 finding where the minor's "mother had told him [the conduct] was wrong" and "he appeared to understand"]; *J.E.,* at p. 315 [evidence of prior school discipline supported determination the minor knew "disrespectful and violent conduct" toward authority figures was wrong].)

Finally, the circumstances surrounding the offenses—the "preparation for" and a "cover up"—support the court's section 26 finding. (*J.E., supra,* 54 Cal.App.5th at p. 316.) D.R. posted the threat on another person's social media account in an effort to avoid detection; when his parents received the threat notification, D.R. pretended to wonder whether the culprit had been arrested rather than admitting he had posted the threat as a joke. Indeed, D.R.'s notion that the post might result in arrest is extraordinarily probative of his knowledge of its wrongfulness. And when he was arrested, D.R. attempted to "minimize" his actions. (*In re Paul C., supra,* 221 Cal.App.3d at p. 53; *People v. Lewis, supra*, 26 Cal.4th at p. 379 [the minor's evasive actions after the crime supported section 26 finding].) Together, this evidence amply supports the court's determination that D.R. knew it was wrong to threaten a mass shooting at his school.

In urging us to reach a contrary conclusion, D.R. recites evidence that he claims shows the Instagram post was a joke and that he did not understand a joke could be wrong. This strategy is not persuasive because we cannot reweigh the evidence or substitute our judgment for that of the trial court. The question before us is whether there is reasonable and credible evidence from which the lower court could find, by clear and convincing evidence, that D.R. appreciated it was wrong to surreptitiously post a death threat on a classmate's social media. (*J.E., supra,* 54 Cal.App.5th at p. 313.) As discussed above, the answer is yes.

Also unavailing is D.R.'s claim that the prosecution failed to establish he appreciated the wrongfulness of posting the message on his classmate's Instagram account—the basis of the second and third counts. The evidence supporting the finding that D.R. knew it was wrong to make a death threat also supports the conclusion that D.R. knew it was wrong to post that threat on his classmate's social media account. (*In re Harold M.* (1978) 78 Cal.App.3d 380, 388–389 [where minor understood it was wrong to break into the victim's car, "he also understood that planning with others to break into the vehicle . . . was wrong"].) To the extent D.R. suggests the prosecution was required to establish he knew his conduct was criminal, he cites no authority; indeed, authority is to the contrary. (*Id.* at p. 388 [minor did not need to appreciate "the elements of a conspiracy" to know it was wrong to agree to burglarize a car with two other minors].)

II.

*Substantial Evidence Supports the Criminal*
*Threat Adjudication*

Next, D.R. contends the prosecution failed to prove he intended the Instagram post "to be perceived as a threat."

A.     General Principles

To establish a criminal threat in violation of section 422, the "prosecution must prove '(1) that the defendant "willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person," (2) that the defendant made the threat "with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out," (3) that the threat—which may be "made verbally, in writing, or by means of an electronic communication device"—was "on its face and under the circumstances in which it [was] made, . . . so unequivocal,

9

unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat," (4) that the threat actually caused the person threatened "to be in sustained fear for his or her own safety or for his or her immediate family's safety," and (5) that the threatened person's fear was "reasonabl[e]" under the circumstances.' " (*In re George T.* (2004) 33 Cal.4th 620, 630 (*George T.*).)

Our focus is on the second element:  whether D.R. made the threat " 'with the specific intent that the statement . . . be taken as a threat.' " (*George T., supra,* 33 Cal.4th at p. 630.)  As stated above, "section 422 does not require an intent to actually carry out the threatened crime.  [Citation.]  Instead, the defendant must intend for the victim to receive and understand the threat, and the threat must be such that it would cause a reasonable person to fear for his or her safety." (*People v. Wilson* (2010) 186 Cal.App.4th 789, 806.)  "[T]he determination whether a defendant intended his words to be taken as a threat . . . can be based on all the surrounding circumstances and not just on the words alone." (*People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1340.)

Under the traditional standard of review for assessing sufficiency of the evidence, an appellate court views the evidence in the light most favorable to the judgment and presumes all reasonable factual inferences were drawn in its favor. (*People v. Staten* (2000) 24 Cal.4th 434, 460.)  D.R. urges us to apply a heightened standard of review because "a section 422 violation raises First Amendment concerns."  According to D.R., we should undertake an independent review of the evidence, as our Supreme Court did in *George T.,* a case involving a criminal threat adjudication against a minor who disseminated a poem with arguable expressive value. (*George T., supra,* 33 Cal.4th at pp. 635–636.)

10

*George T.* held reviewing courts should "make an independent examination of the record . . . when a defendant raises a plausible First Amendment defense to ensure that a speaker's free speech rights have not been infringed by a trier of fact's determination that the communication at issue constitutes a criminal threat." (*George T., supra,* 33 Cal.4th at p. 632.) But as *George T.* explained, "[i]ndependent review is not the equivalent of de novo review 'in which a reviewing court makes an original appraisal of all the evidence to decide whether or not it believes' the outcome should have been different. [Citation.] Because the trier of fact is in a superior position to observe the demeanor of witnesses, credibility determinations are not subject to independent review, nor are findings of fact that are not relevant to the First Amendment issue. [Citations.] . . . [U]nder the substantial evidence standard, the question is whether any rational trier of fact could find the legal elements satisfied beyond a reasonable doubt, whereas under independent review, an appellate court exercises its independent judgment to determine whether the facts satisfy the rule of law." (*Id.* at p. 634.)

The *George T.* court determined the minor's poem "was not an unequivocal threat" and, as a result, did not consider whether the minor "harbor[ed] the specific intent to threaten the students, as required by section 422." (*George T, supra,* 33 Cal.4th at p. 639.) At least one court has suggested that even "if independent review is appropriate, it is applicable only to issues that could implicate the First Amendment, such as the content of [the] communications; sufficiency of the evidence to support the jury's finding on intent is determined according to the usual substantial evidence standard." (*People v. Lopez* (2015) 240 Cal.App.4th 436, 447.) We need not decide which standard applies to the intent element because "we would affirm under either one." (*Id.* at p. 447.)

11

B.    There is Sufficient Evidence D.R. Had the Specific Intent the Instagram Post be Taken as a Threat

Our independent review of the record establishes D.R. intended readers to perceive the Instagram post as a threat. Given the prevalence of school shootings, a threat of a mass shooting—particularly a clear, unequivocal statement to " 'shoot up' " the school at a specific time with a specific weapon—is extremely likely to be taken as a serious threat. The circumstances of the threat support the conclusion that D.R. intended for the Instagram post to be perceived as genuine. A month before D.R. posted the threat, the principal and D.R.'s parents told D.R. that threatening a school shooting would "scare[]" people because they would take the comment "seriously." Threatening to commit a mass shooting under these circumstances establishes D.R. intended for the social media post to be taken as a threat. Moreover, when a similar threat was made the day before at his sister's school, classes were cancelled. This evidence strongly suggests D.R. was hoping for the same result when he made the threat against his school.

This case bears no resemblance to *In re Ricky T.* (2001) 87 Cal.App.4th 1132, cited by D.R. There, the minor cursed at his teacher and said, " 'I'm going to get you' " after the teacher accidentally hit him with a classroom door. (*Id.* at p. 1135.) The minor apologized and acknowledged his actions were inappropriate. (*Ibid.*) D.R.'s threat was not, as in *Ricky T.,* an "emotional response to an accident." (*Id.* at p. 1141.) It was a deliberate action, calculated to put students and staff in fear. And unlike the minor in *Ricky T.*, D.R. did not apologize; instead, he tried to minimize his involvement.

## III.

### *The Court Properly Imposed Drug and Alcohol Testing as a Condition of Probation*

Where—as here—the court declares a minor a ward of the court and places him on probation, Welfare and Institutions Code section 729.3 authorizes the court to impose a probation condition requiring "the minor to submit to urine testing upon the request of a peace officer or probation officer for the purpose of determining the presence of alcohol or drugs." (Welf. & Inst. Code, § 729.3; *In re Kacy S.* (1998) 68 Cal.App.4th 704, 708 (*Kacy S.*).) Welfare and Institutions Code "section 729.3 commits the decision to order testing in a particular case to the juvenile court's discretion." (*Kacy S.,* at p. 708.)

The court did not abuse its discretion in imposing the testing condition pursuant to Welfare and Institutions Code section 729.3. D.R. experimented with marijuana, had impulse control issues, and needed support learning how to follow rules and act appropriately. The court could reasonably infer that D.R.'s knowledge that "he's subject to testing" would help him understand he could not use illegal substances. (See *Kacy S., supra,* 68 Cal.App.4th at pp. 708–709 [upholding testing condition]; *In re Laylah K.* (1991) 229 Cal.App.3d 1496, 1502 [same], overruled on another point in *In re Sade C.* (1996) 13 Cal.4th 952, 962, fn. 2.)

D.R. challenges the testing condition under *People v. Lent* (1975) 15 Cal.3d 481, 486 (*Lent*).[2] The court in *Kacy S.* rejected a similar argument.

---

[2] A condition of probation is invalid under *Lent* "if it ' " '(1) has no relationship to the crime of which the offender was convicted, (2) relates to conduct which is not in itself criminal, and (3) requires or forbids conduct which is not reasonably related to future criminality.' " ' [Citations.] 'The *Lent* test "is conjunctive—all three prongs must be satisfied before a

It explained that the "testing condition is designed to detect the presence of substances whose use by minors *is unlawful*. [Citations.] Thus, the testing ' "relates to conduct which is . . . in itself criminal." ' [Citation.] Moreover, in enacting section 729.3, the Legislature has found that 'alcohol and drug abuse' are 'precursors of serious criminality . . . .' [Citation.] Thus, the testing is also ' "reasonably related to future criminality." ' [Citation.] Because the testing condition relates to criminal conduct and is reasonably related to future criminality, its imposition is within the juvenile court's discretion even as measured by the *Lent* formulation." (*Kacy S., supra,* 68 Cal.App.4th at p. 710.) We reach the same result.

DISPOSITION

The judgment is affirmed.

---

reviewing court will invalidate a probation term." ' " (*People v. Cruz* *Cruz* (2020) 54 Cal.App.5th 707, 711.) *Lent* has been superseded by statute on another ground as stated in *People v. Moran* (2016) 1 Cal.5th 398, 403, fn. 6.

_____

Reardon, J.*

WE CONCUR:


_____

Needham, Acting P.J.


_____

Burns, J.


A156827

_____

\* Judge of the Superior Court of Alameda County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.