Filed 4/16/21 (unmodified opn. attached)

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MICHAEL ARTHUR BRUGMAN,<br><br>    Defendant and Appellant. | D076658<br><br>(Super. Ct. No. SCE362485)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>NO CHANGE IN JUDGMENT |

THE COURT:

The opinion filed March 30, 2021, is hereby modified as follows:

On the second line of page 16, add a new footnote 5 and renumber the remaining footnotes. Specifically, new footnote 5 shall be inserted on page 16, following the sentence ending "how that term was intended to be understood."

5    For the first time in a petition for rehearing, Brugman argues that instead of rejecting the pinpoint instruction requested by defense counsel, the trial court, sua sponte, should have modified the proposed instruction to prevent any jury confusion regarding the definition of "reckless conduct." Specifically, Brugman argues the trial court should have given

defense counsel's proposed instruction, but also should have informed the jury that, as used in the instruction, the term "reckless conduct" referred to criminal negligence.

We need not, and do not, decide whether a trial court might ever be required to sua sponte modify a confusing pinpoint instruction proposed by defense counsel. Instead, we reject Brugman's argument because a trial court may properly reject a pinpoint instruction that is duplicative of other instructions. (*Moon, supra,* 37 Cal.4th at p. 30.) As *Williams* explains, criminally negligent conduct is "not enough" to support an assault conviction "because a jury cannot find a defendant guilty of assault based on facts he *should have known* but did not know." (*Williams, supra*, 26 Cal.4th at p. 788, italics added.) The jury was already informed of this principle in CALCRIM No. 875, which states that, for assault, the People must prove that "[w]hen the defendant acted, *he was aware of facts* that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone."

Appellant's petition for rehearing is denied. There is no change in judgment.

O'ROURKE, Acting P. J.

Copies to: All parties

2

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MICHAEL ARTHUR BRUGMAN,<br><br>    Defendant and Appellant. | D076658<br><br><br>(Super. Ct. No. SCE362485) |

APPEAL from a judgment of the Superior Court of San Diego County, John M. Thompson, Judge.  Affirmed.

Theresa O. Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos and Eric A. Swenson, Deputy Attorneys General, for Plaintiff and Respondent.

In two separate trials involving two different victims, juries found Michael Arthur Brugman guilty of three counts of corporal injury to someone

with whom he had a dating relationship (Pen. Code, § 273.5, subd. (a))[1] (counts 1, 7, 11); three counts of violating a protective order (§ 166, subd. (c)(1)) (counts 2, 4, 8); one count of assault with a deadly weapon (§ 245, subd. (a)(1)) (count 3); one count of making a criminal threat (§ 422) (count 5); one count of rape of an unconscious person (§ 261, subd. (a)(4)) (count 9); and one count of false imprisonment (§§ 236, 237, subd. (a)) (count 12). The trial court found that the corporal injury counts were committed within seven years of a previous conviction for aggravated assault (§ 245). (§ 273.5, subd. (f)(1).) It also found that certain of the counts were committed while Brugman was out on bail (§ 12022.1, subd. (b)), and that Brugman incurred a serious felony prior (§ 667, subd. (a)(1)), a strike prior (§ 667, subds. (b)-(i)), and a prison prior (§ 667.5, subd. (b)). The trial court sentenced Brugman to a prison term of 25 years, 8 months.

Brugman contends (1) the trial court prejudicially erred in denying his request for a pinpoint instruction with respect to the count of assault with a deadly weapon; (2) insufficient evidence supports the convictions for assault with a deadly weapon and making a criminal threat; and (3) the trial court abused its discretion by not striking Brugman's prior strike (§ 667, subds. (b)-(i)), or the five-year enhancement for Brugman's serious felony prior (§ 667, subd. (a)(1)).

We conclude that Brugman's arguments lack merit, and accordingly we affirm the judgment.

---

[1] Unless otherwise indicated, all further statutory references are to the Penal Code.

I.

FACTUAL AND PROCEDURAL BACKGROUND

A.    *Brugman's Offenses Against C.*

Brugman and C.[2] began dating in 2015, and by July 2016, they were living together in a room they rented in a house.  On July 14, 2016, C. called 911 to report that Brugman had physically assaulted her during an argument.  As C. later testified, Brugman shoved her onto the bed and punched her in the face three or four times, giving her a split lip, facial swelling, and a black eye.  Brugman was arrested and a protective order was issued that prevented Brugman from having contact with C.

Brugman and C. reconciled within a few days and resumed their relationship.  During a traffic stop on July 22, 2016, because Brugman was with C. in his vehicle, he was arrested for violating the protective order.

In November 2016, Brugman and C. were still in a relationship.  C. lived at her mother's apartment and Brugman lived in a house with his father and grandmother.  Brugman had access to his grandmother's Toyota Corolla, and he allowed C. to drive it.  According to C.'s testimony, on the evening of November 27, 2016, she was with Brugman at his house, planning to spend the night.  However, C. perceived a change in Brugman's behavior and believed Brugman would use physical violence against her if she stayed.  Under the pretense of going to the store, C. got into the Corolla and drove toward her mother's apartment.  By using a tracking application on his cell phone, Brugman determined that C. was not on the way to the store, and he drove to intercept her.  Brugman caught up with C. on the freeway and then followed her to the vicinity of her mother's apartment.  Video from security

---

2    To protect their privacy, we use first initials in referring to the victims of Brugman's crimes.

3

cameras depict Brugman's attempts to prevent C. from entering the driveway that led into her mother's apartment complex.

When C. first attempted to turn into the driveway of the apartment complex, Brugman was already there, with his car parked across the driveway, blocking it. As C. approached, Brugman got out of his car and ran into the street to C.'s car, but C. quickly drove away. Brugman got back into his car and drove after C. After less than a minute, C. drove back down the street, toward the apartment complex's driveway, after having turned around. As C. started to make a left turn from the street into the driveway, Brugman sped toward C.'s car at a high rate of speed in the wrong lane of traffic. Brugman crashed his car into C.'s car as it was making the left turn, causing a violent impact to the driver's side of C.'s car and also causing the trunk of C's car to pop open. Brugman quickly exited his car to try to run up to C.'s car, but C. sped away. Brugman got back into his car and followed C. once again. On C's third attempt to enter the driveway, she was successful.

As C. drove into the apartment complex to park near her mother's apartment, Brugman exited his vehicle, left it in the street, and gave chase on foot. Brugman ran up to C. in her parked car and sat in the passenger seat, where he grabbed C.'s hair and said something such as, "[B]itch, you can't get away from me." C. repeatedly honked the horn, escaped from the car and ran up the stairs to her mother's apartment. After briefly chasing after C., Brugman returned to C.'s car, took the car keys and then left. Police responded to the location after Brugman fled the scene.

Brugman and C. again reconciled and moved into a studio unit together in January 2017. As C. testified, after they lived in the studio for approximately a week, Brugman started insulting and controlling her. According to C., Brugman "would tell me daily if I ever said anything, he was

4

going to kill me, quote, I will put a bullet in your skull. He told me he would run over my mother with his car. . . . He said that he will kill my children." C. explained that she did not leave because "I was afraid of dying and I was afraid of something happening to any of my family, either one of my children, I was afraid that maybe he would kill himself and I would be held accountable for it. I was really afraid for myself and for my family." Brugman told C. that if she left and he couldn't find her, he would hurt one person she cared about for each day she hid from him. When asked whether she believed Brugman's threats or whether "he [was] just talking," C. testified, "I believed him, because he said that everything that he had ever said actually materialized."

C. recounted an episode in which she tried to leave by running out of the gate outside the studio, but Brugman held a knife to her and said "I will use this. I will put this in you." C. believed that Brugman would follow through on his threat to stab her if she left. Another time, when they were in Home Depot, Brugman suspected that C. was thinking of fleeing, and he said he would use a tool from the store to stab her if she tried to leave. According to C., while they lived in the studio, Brugman would hit her, shove her, or violently squeeze her every couple of days. During the same time period, Brugman would also choke C. until she was unconscious.

One incident that occurred while they lived in the studio was identified by the prosecutor to the jury as the basis for the charge that Brugman made a criminal threat toward C. (§ 422) (count 5). C. testified that one day in the studio, during an argument, Brugman started loading bullets into what she believed was a revolver, although she previously believed that Brugman did not have a firearm. Brugman said, "You know what, I'm done with this shit. I'm going to kill you. I'm going to smoke you right now." Brugman put the

5

gun to C.'s head. As C. testified, "He was going on and on about how he was tired of me, that he was going to smoke me, that everybody is going to cry because [C.'s] gone, that I'm going to go six feet under, nobody is ever going to find my body." C. testified that she was "scared" and she "froze."

C. attempted to diffuse the situation by talking to Brugman, trying to "console" him, and stating that they could change things. In response, as C. described, "It's like he went in and out of . . . himself and, like, for a second, like, cried, and then the next second he was, like, no, no, no, like fighting with himself. And he was, like, 'No, no, I'm going to kill you.' And he'd put it back up to my head, and then he'd put it down . . . ." The prosecutor asked C. if the gun was "fully exposed" during the incident. C. answered "no" and explained that Brugman "held the gun and then wrapped his hand and a gun in a towel, a white towel." Although C. did not know the exact date of the incident, she believed it happened around the date of a relative's birthday on February 9, 2017. Brugman eventually put away the gun in a gym bag. The only time that C. saw the gun was during that incident.

C. testified that, based on Brugman's behavior, she began to believe in the middle of March 2017 that if she did not get away from Brugman, she would end up dead in the next few days. On the morning of March 15, 2017, C. left the studio while Brugman was sleeping and called the police from a neighbor's house. When police arrived, they arrested Brugman and documented swelling and bruising on C.'s body. The police searched the studio, but they did not locate a firearm.

C. moved out of the studio, taking Brugman's belongings with her, including his cell phone and laptop computer. On Brugman's cell phone, C. discovered a video and photographs that Brugman had taken of her nude body in the studio while she was unconscious. Some of the photographs show

6

Brugman's semen coming out of C.'s vagina while she was unconscious. C. testified that she had no knowledge of the video and the photographs before finding them on Brugman's phone and that she did not consent to sex with Brugman during the depicted incident. C. turned over Brugman's cell phone to the police.

B.    *Brugman's Offenses Against A.*

In June 2017, while Brugman was out on bail, he started dating A. On July 7, 2017, Brugman and A. were alone in Brugman's bedroom in the house he shared with his father and grandmother. Brugman asked for A. to unlock her cell phone so he could access its content. When A. did not unlock the phone fast enough, Brugman got on top of her on the bed and started strangling her, telling her to give him the passcode for the phone. As A. started to black out, Brugman released his hands, and she gave him the passcode. A. asked to leave the bedroom, and Brugman punched her in the face. Brugman kept A. in the bedroom for approximately an hour while he looked through her cell phone. When Brugman moved away from the bedroom door, A. ran out of the door and down the hall in an attempt to escape, but Brugman grabbed her in the hall and dragged her back to the bedroom. Brugman threw A. on the bed and punched her in the face four or five times. Brugman then started strangling A., which she believes caused her to pass out. Brugman allowed A. to go into the attached bathroom, where she hoped to escape through the window, but Brugman came into the bathroom and closed the window. Back in the bedroom, Brugman put A. into a chokehold, in a position that also hurt A.'s foot when she struggled to get up. Brugman released the chokehold, and A. started crying in pain.

Brugman apologized, and A. decided that the best strategy was to try to be nice to Brugman so that he would eventually let her leave. Although A.

was afraid of Brugman and wanted to leave, she allowed him to engage in sexual intercourse with her. A. then suggested they leave and go to a restaurant. Once outside, A. pretended to receive a phone call from a relative who needed her to come home. Brugman allowed A. to leave, although he insisted that she talk with him on the phone while she was driving. Eventually, A. contacted the police.

C.     *The Criminal Prosecution of Brugman*

A consolidated information charged Brugman with ten counts based on his conduct toward C.: two counts of corporal injury of someone with whom he had a dating relationship (§ 273.5, subd. (a)) (counts 1, 7); three counts of violating a protective order (§ 166, subd. (c)(1)) (counts 2, 4, 8); one count of assault with a deadly weapon (§ 245, subd. (a)(1)) (count 3); one count of making a criminal threat (§ 422), with the further allegation that Brugman personally used a firearm in making the criminal threat (§ 12022.5, subd. (a)) (count 5); one count of possession of a firearm by a felon (§ 29800, subd. (a)(1)) (count 6); one count of rape of an unconscious person (§ 261, subd. (a)(4)) (count 9); and one count of sexual penetration of an unconscious victim (§ 289, subd. (d)) (count 10).

The same consolidated information charged Brugman with three counts based on his conduct toward A: one count of corporal injury of someone with whom he had a dating relationship (§ 273.5, subd. (a)) (count 11); one count of false imprisonment (§§ 236, 237, subd. (a)) (count 12); and one count of forcible rape (§ 261, subd. (a)(2)) (count 13).

For the three counts alleging corporal injury in violation of section 273.5, subdivision (a), it was alleged that Brugman had committed aggravated assault (§ 245) within the last seven years. (§ 273.5, subd. (f)(1).) As to several of the counts, it was also alleged that Brugman was out on bail

8

at the time he committed the offenses. (§ 12022.1, subd. (b).) The consolidated information alleged that Brugman incurred a serious felony prior (§ 667, subd. (a)(1)), a strike prior (§ 667, subds. (b)-(i)), and a prison prior (667.5, subd. (b)).

The trial court granted Brugman's motion to sever the jury trial for the counts involving C. and the counts involving A. Therefore, two different juries were impaneled, and the trial court held two different trials.

Brugman testified in his own defense during the trial on the counts involving C. Brugman testified that he did not strike C. during the incident in July 2016, but instead took a defensive posture while C. tried to strike him. According to Brugman, the injury to C.'s lip was from when C. hit herself with her cell phone. Brugman denied ever making a threat against C. or her family, and denied ever putting a gun to C.'s head. Brugman testified that he only accidently crashed into C.'s car during the November 27, 2016 incident, as he miscalculated when trying to position his car to block the driveway before C. arrived there. Brugman did admit, however, that he was driving 35 to 40 miles per hour when he struck C.'s car. Brugman also testified that he never had sex with C. while she was unconscious, and that C. was awake during the sexual intercourse that led to the photos of his semen exiting her vagina. According to Brugman, the bruises on C. when the police responded on March 15, 2017, were from incidents when C. fainted and fell down.

During closing argument in the trial on the counts involving C., the prosecutor explained to the jury the conduct on which the People based each of the counts. Count 1, which alleged infliction of corporal injury to someone with whom he had a dating relationship, was based on the July 14, 2016 incident during which Brugman struck C. in the face and she called the

9

police.  Count 3, which alleged assault with a deadly weapon, was based on the November 27, 2016 incident during which Brugman drove his vehicle into the car that C. was driving, with Brugman's vehicle as the deadly weapon. Count 5, which alleged the making of a criminal threat, was based on the incident that occurred while Brugman and C. lived in the studio between January and March 2017, during which Brugman put a gun to C.'s head and said he was going to "smoke" her.  Count 6, which alleged possession of a firearm by a felon, was based on "that same time period between January and March where [C.] testified he had the revolver."  Count 7, which alleged corporal injury, was based on the bruising and other injuries that Brugman inflicted on C. in March 2017 when they lived in the studio.  Counts 2, 4, and 8, which alleged violation of a protective order, were based on Brugman being present with C. during the July 22, 2016 traffic stop, the November 27, 2016 car crash incident, and his residence with C. in the studio.  Counts 9 and 10, which alleged rape of an unconscious person and sexual penetration of an unconscious person were both based on the incident in the studio during which Brugman took a video and photographs of C. while she was unconscious, including with semen exiting her vagina.

The jury returned a guilty verdict on each count except for count 6, which charged Brugman with possession of a firearm by a felon (§ 29800, subd. (a)(1)) and count 10, which charged Brugman with sexual penetration of an unconscious victim (§ 289, subd. (d)).  In addition, on count 5, although the jury found Brugman guilty of making a criminal threat (§ 422), it made a "not true" finding on the allegation that Brugman personally used a firearm in making the criminal threat (§ 12022.5, subd. (a)).

In the trial on the three counts involving A., Brugman did not testify. The jury found Brugman guilty of corporal injury to someone with whom he

had a dating relationship (§ 273.5, subd. (a)) and false imprisonment (§§ 236, 237, subd. (a)).  The jury could not reach a verdict on the forcible rape count (§ 261, subd. (a)(2)).  The trial court declared a mistrial as to that count, and the People subsequently dismissed it.

The trial court found that the corporal injury counts were committed within seven years of a previous conviction for aggravated assault (§ 245). (§ 273.5, subd. (f)(1).)  It also found that certain of the counts were committed while Brugman was out on bail (§ 12022.1, subd. (b)), and that Brugman incurred a serious felony prior (§ 667, subd. (a)(1)), a strike prior (§ 667, subds. (b)-(i)), and a prison prior (§ 667.5, subd. (b)).  The trial court sentenced Brugman to a prison term of 25 years, 8 months.

## II.

## DISCUSSION

A.  *The Trial Court Did Not Err In Declining to Instruct the Jury With the Pinpoint Instruction Proposed by Defense Counsel For the Crime of Assault With a Deadly Weapon*

We first consider Brugman's contention that the trial court erred in refusing defense counsel's request for a pinpoint instruction to be added to CALCRIM No. 875, which instructed the jury on the crime of assault with a deadly weapon.

As given to the jury, CALCRIM No. 875 stated in relevant part:

"To prove that the defendant is guilty of this crime, the People must prove that:

"1.    The defendant did an act with a deadly weapon other than a firearm that by its nature would directly and probably result in the application of force to a person;

"2.    The defendant did that act willfully;

"3.    When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act

11

by its nature would directly and probably result in the application of force to someone;

"AND

"4. When the defendant acted, he had the present ability to apply force with a deadly weapon other than a firearm to a person;

"Someone commits an act *willfully* when he or she does it willingly or on purpose. It is not required that he or she intend to break the law, hurt someone else, or gain any advantage. [¶] . . . [¶]

"The People are not required to prove that the defendant actually intended to use force against someone when he acted."

Defense counsel requested a pinpoint instruction stating that "reckless conduct alone does not constitute a sufficient basis for assault, even if the assault results in an injury to another." Counsel argued that the requested instruction was supported by our Supreme Court's examination in *People v. Williams* (2001) 26 Cal.4th 779 (*Williams*) of the mental state required for the crime of assault.

" ' "[I]n appropriate circumstances" a trial court may be required to give a requested jury instruction that pinpoints a defense theory of the case . . . .' " (*People v. Moon* (2005) 37 Cal.4th 1, 30 (*Moon*).) However, "a trial court may properly refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing . . . or if it is not supported by substantial evidence." (*Ibid.*, citation omitted.) As we will explain, the trial court properly refused defense counsel's proffered pinpoint

12

instruction because it was, at best, potentially confusing, and at worst, an incorrect statement of the law.[3]

In *Williams*, *supra*, 26 Cal.4th 779, our Supreme Court undertook its latest effort to clarify the mental state required for the crime of assault, building on its prior opinions in *People v. Rocha* (1971) 3 Cal.3d 893 and *People v. Colantuono* (1994) 7 Cal.4th 206 (*Colantuono*). *Williams* held that although assault is a general intent crime, "a defendant guilty of assault must be aware of the facts that would lead a reasonable person to realize that a battery would directly, naturally and probably result from his conduct. He may not be convicted based on facts he did not know but should have known. He, however, need not be subjectively aware of the risk that a battery might occur." (*Williams,* at pp. 787-788.) "For example, a defendant who honestly believes that his act was not likely to result in a battery is still guilty of assault if a reasonable person, viewing the facts known to defendant, would

---

[3]     With respect to the standard of review, Brugman contends that a de novo standard applies, citing *People v. Johnson* (2009) 180 Cal.App.4th 702, 707. The People do not address the relevant standard of review. Our Supreme Court has stated that "the independent or de novo standard of review is applicable in assessing whether instructions correctly state the law" (*People v. Posey* (2004) 32 Cal.4th 193, 218), but recently applied an abuse of discretion standard in reviewing challenges to the denial of a pinpoint instruction on the ground that it was duplicative (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 497; see also *People v. Gonzales* (2012) 54 Cal.4th 1234, 1297-1298 [applying an abuse of discretion review to the trial court's denial of pinpoint instructions on mitigating factors in the penalty phase of a capital trial]). While we acknowledge that an abuse of discretion standard may be applicable in some instances where the denial of a pinpoint instruction is at issue, because the People do not argue for an abuse of discretion review, and because one of the issues presented is whether the proposed pinpoint instruction incorrectly stated the law, we will independently review Brugman's contention that his proposed pinpoint instruction was improperly denied.

13

find that the act would directly, naturally and probably result in a battery." (*Id*. at p. 788, fn. 3.)

*Williams* clarified that "[i]n adopting this knowledge requirement, we do not disturb our previous holdings." (*Williams*, *supra*, 26 Cal.4th at p. 788.) Among other things, *Williams* specifically reaffirmed the holding in *Colantuono* that " '[r]eckless conduct alone does not constitute a sufficient basis for assault or for battery even if the assault results in an injury to another.' " (*Colantuono*, *supra*, 7 Cal.4th at p. 219.) As *Williams* reaffirmed, "mere recklessness or criminal negligence is still not enough" to satisfy the mental state for assault. (*Williams*, at p. 788.) However, in reaffirming *Colantuono*'s holding, *Williams* clarified that the term "reckless conduct" did not have the meaning commonly attached to it in modern usage. As *Williams* explained, "In stating that reckless conduct cannot constitute an assault, *Colantuono* relied on *People v. Lathus* [(1973)] 35 Cal.App.3d [466] at page 469, which in turn relied on our 1951 decision in *People v. Carmen* [(1951)] 36 Cal.2d [768] at pages 775–776, which in turn relied on even older case law. Thus, *Colantuono* meant 'recklessness' in its *historical sense* as a synonym for criminal negligence, rather than its more *modern conception* as a subjective appreciation of the risk of harm to another." (*Williams*, at p. 788, fn. 4, italics added.)[4]

_____

[4]    As our Supreme Court has explained, the modern definition of reckless conduct is set forth in the Model Penal Code.  " 'A person acts recklessly with respect to a material element of an offense when he *consciously disregards* a substantial and unjustifiable risk that the material element exists or will result from his conduct.  The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.'  (Model Pen. Code[,] § 2.02, subd. (2)(c).)" (*People v. Clark* (2016)

14

Quoting the language from *Colantuono* that was reaffirmed in *Williams,* defense counsel requested a pinpoint instruction stating that "reckless conduct alone does not constitute a sufficient basis for assault, even if the assault results in an injury to another." As we will explain, however, in light of *Williams*'s further clarification that "reckless conduct" in *Colantuono* meant criminal negligence, rather than the modern definition of recklessness, the pinpoint instruction requested by defense counsel was properly rejected. At best, the instruction would have confused the jury, and at worst, it would have been understood by the jury as an incorrect statement of the law. (*Moon, supra,* 37 Cal.4th at p. 30 ["a trial court may properly refuse an instruction offered by the defendant if it incorrectly states the law . . . or [is] potentially confusing"].)

The potential confusion arises because the term "reckless conduct" was not further defined in defense counsel's proposed pinpoint instruction. As *Williams* explains, the term can be used in the historical sense, as a synonym for criminal negligence, or it can be used in its modern sense, meaning that someone acts with a subjective appreciation of the risk of harm. With no further definition, the bare use of the term "reckless conduct" in the pinpoint

_____

63 Cal.4th 522, 617, italics added.) "This definition encompasses both subjective and objective elements. The *subjective* element is the defendant's conscious disregard of risks known to him or her." (*Ibid*., italics added.) In contrast, criminal negligence exists when the defendant's conduct is " ' "such a departure from what would be the conduct of an ordinarily prudent or careful [person] under the same circumstances as to be incompatible with a proper regard for human life . . . or an indifference to consequences." ' " (*People v. Valdez* (2002) 27 Cal.4th 778, 788.) Further, " 'Under the criminal negligence standard, knowledge of the risk is determined by an *objective test*: "[I]f a reasonable person in defendant's position *would have been* aware of the risk involved, then defendant is presumed to have had such an awareness." ' " (*Id*. at p. 783, italics added.)

15

instruction could easily have caused confusion as to how that term was intended to be understood. Further, any juror who interpreted the pinpoint instruction to intend the modern meaning of "reckless conduct" would have been operating under an *incorrect* statement of the law. As *Williams* makes clear, "reckless conduct" is insufficient to establish the mental state for assault *only* when that term is used in its historical sense as a synonym for criminal negligence. Therefore, the trial court properly declined to instruct the jury with the pinpoint instruction proposed by defense counsel.[5]

B. *The Conviction for Assault with a Deadly Weapon is Supported by Substantial Evidence*

We next consider Brugman's contention that insufficient evidence supports the conviction for assault with a deadly weapon.

In considering a challenge to the sufficiency of the evidence, "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact

[5]     In his reply brief, Brugman contends that "[j]uries have been instructed in post-*Williams* cases that 'mere reckless conduct is insufficient,' without that instruction being held error." The sole citation Brugman provides is *People v. Ervine* (2009) 47 Cal.4th 745, at page 805. *Ervine* was an appeal in a death penalty case following a 1996 trial, held years before our Supreme Court issued *Williams* in 2001. Therefore, although the jury instruction in *Ervine* stated that " 'reckless conduct is insufficient' " for assault (*Ervine*, at p. 805), *Ervine* does not support Brugman's contention that, even after *Williams*, juries have been properly instructed that reckless conduct does not constitute a sufficient basis for assault. (See *People v. Bipialaka* (2019) 34 Cal.App.5th 455, 460 (*Bipialaka*) [rejecting appellant's argument that, based on the jury instruction quoted in *Ervine*, reckless conduct is insufficient to establish assault, explaining that "[t]his quotation . . . is from a 1996 trial court jury instruction, not from a Supreme Court holding modifying *Williams*"].)

could find the defendant guilty beyond a reasonable doubt. . . . We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. . . . If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. . . . 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' " (*People v. Albillar* (2010) 51 Cal.4th 47, 60, citations omitted.)

The conviction for assault with a deadly weapon was based on Brugman's act of crashing his vehicle into the car being driven by C. as she tried to enter the driveway to her mother's apartment complex. As we have explained, to find Brugman guilty of assault, the jury was required to find that Brugman was "aware of the facts that would lead a reasonable person to realize that a battery would directly, naturally and probably result from his conduct." (*Williams*, *supra*, 26 Cal.4th at p. 788.) Further, the jury was instructed with CALCRIM No. 875 that to find Brugman's vehicle constituted a deadly weapon, it was required to find that Brugman's vehicle was "used in such a way that it [was] capable of causing and likely to cause death or great bodily injury." (See *People v. Perez* (2018) 4 Cal.5th 1055, 1065 ["a 'deadly weapon' under section 245, subdivision (a)(1) is ' "any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury," ' " and "cases have recognized a vehicle as a deadly weapon based on the manner it was used"].)

Brugman contends that the evidence was insufficient "for a rational juror to find beyond a reasonable doubt that at the time of the collision, [Brugman] committed an act he knew would directly and probably result in a battery upon [C.]." Further, he argues that the deadly weapon requirement

17

was not met because the evidence was insufficient for the jury to find "a willful use of his car in a manner known to likely and probably cause or produce death or great bodily injury." According to Brugman, the evidence is insufficient to support those necessary findings because "the video evidence did not show [Brugman] willfully used the vehicle in a manner he knew would probably and directly result in physical force against [C.]." He claims that "the record showed that although [Brugman] was trying to drive to block the driveway of the apartment complex, at the time of the collision, his car had pulled [alongside] and was turning to the left, away from the car driven by [C.] – appearing to attempt to avoid rather than cause a battery." According to Brugman, "the surveillance video evidence does not show [Brugman] ramming his vehicle into his grandmother's car."

Having reviewed the surveillance video, we reject Brugman's characterization of the collision, as it does not accurately describe the scene depicted in the video. The video provides more than ample support for a reasonable juror to conclude that Brugman knowingly drove his car in a manner intended to produce a high-speed collision with the driver's side of C.'s car. The video is taken from a camera that looks out from the apartment complex toward the driveway entrance. A city street runs past the driveway entrance. The video shows C.'s car approach the apartment complex from the right of the screen at a moderate speed and then begin to make a left turn into the driveway. As C. initiates the turn, Brugman's car enters the video from the right of the screen, driving in the wrong lane of traffic and at an obviously higher speed than C. was driving. Brugman drives straight toward C.'s car as it starts to make a left turn. The front of Brugman's car violently collides with the driver's side of C.'s car near the center of the roadway. There is no indication in the video that Brugman was attempting to avoid the

18

collision, and no indication that Brugman slowed down before striking C.'s car.

The video can easily be interpreted as showing a deliberate collision, and the jury was certainly entitled to reject Brugman's testimony that he was not intending to collide with C.'s car, and instead was attempting to reach the driveway before C. got there. The act of intentionally driving a vehicle into another vehicle at high speed provides substantial evidence to support a conviction for assault with a deadly weapon. (*People v. Golde* (2008) 163 Cal.App.4th 101, 110 [substantial evidence supported conviction for assault when "there was evidence that defendant drove the car toward the victim and repositioned the car toward the victim as she tried to move out of its way"]; cf. *People v. Oehmigen* (2014) 232 Cal.App.4th 1, 5, 11 [defendant was armed with a deadly weapon, in the form of his vehicle, when he drove directly at a car containing two police officers].)

Even were the jury to credit Brugman's testimony that he did not intend to crash into C.'s car, the record would still contain ample evidence to support a finding of assault with a deadly weapon. "[T]he test is whether an objectively reasonable person with knowledge of these facts would appreciate that an injurious collision, i.e., a battery, would directly and probably result from his actions." (*People v. Aznavoleh* (2012) 210 Cal.App.4th 1181, 1189 (*Aznavoleh*) [substantial evidence supported a conviction for assault with a deadly weapon when the defendant deliberately ran a red light while racing another vehicle on a busy city street, striking a car that was turning left at the intersection]; see also *Bipialaka, supra,* 34 Cal.App.5th at pp. 458-459 [substantial evidence supported a conviction for assault with a deadly weapon when the defendant ran a red light at high speed and aimed his car at another car in the intersection, even though a crash did not occur, as the

facts known to the defendant "would directly, naturally, and probably result in physical force being applied to the target car"].) "[A] defendant need not intend to commit a battery, or even be subjectively aware of the risk that a battery might occur. . . . He need only be aware of what he is doing. The foreseeability of the consequences is judged by the objective 'reasonable person' standard." (*Aznavoleh*, at p. 1190, citation omitted.) Brugman was driving at a high rate of speed in the wrong lane of traffic, pursuing someone he knew would likely make a left turn into the apartment complex's driveway. Based on those facts, even if Brugman did not intend to collide with C., a juror would have a solid basis to conclude that a reasonable person, under the circumstances, would realize that his conduct would directly and probably lead to a collision with C.'s vehicle as it tried to enter the driveway. Indeed, because a collision *did* occur, it is reasonable for a finder of fact to conclude that a collision was the direct and probable result of Brugman's conduct, regardless of whether he intended that result.

In sum, we conclude that substantial evidence supports the conviction for assault with a deadly weapon.

C. *The Conviction for Making a Criminal Threat is Supported by Substantial Evidence*

Brugman next challenges the sufficiency of the evidence to support his conviction for making a criminal threat.

1. *The Prosecutor Made a Clear Election as to Which Incident Formed the Basis for the Charge of Making a Criminal Threat*

Before turning to an examination of whether the evidence supports the jury's finding that Brugman made a criminal threat, we must first address what the jury was told regarding which incident the People had selected as the basis for that charge.

Based on the principle that a defendant in a criminal jury trial has the right to a unanimous verdict, "cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act." (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) "This requirement of unanimity as to the criminal act 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.' " (*Ibid.*) "The prosecution can make an election by 'tying each specific count to specific criminal acts elicited from the victims' testimony'—typically in opening statement and/or closing argument. [Citations.] [¶] Under these principles, there is an implicit presumption that the jury will rely on the prosecution's election and, indeed, is bound by it." (*People v. Brown* (2017) 11 Cal.App.5th 332, 341 (*Brown*).)

Here, C. testified about different threats that Brugman made on several occasions while they lived in the studio, any of which could have formed the basis for a charge in count 5 that Brugman made a criminal threat. Accordingly, there was a risk that, unless instructed otherwise, different members of the jury could rely on different incidents in finding Brugman guilty in count 5, which would result in an impermissible non-unanimous verdict. To alleviate that risk and satisfy the unanimity requirement, the prosecutor twice communicated a clear election during closing argument as to the incident that formed the basis for the charge in count 5. First, when initially going through each of the counts and describing the conduct upon which they were based, the prosecutor told the jury, "Count 5 is criminal threat, and then there's an additional allegation that he used a gun while making the threat. That refers to the I'm going to smoke you,

21

revolver to the back of the head . . . ."  Later, while discussing the evidence, the prosecutor reminded the jury, "Count 5, this is the threat where he had the gun, put it to the back of her head and said he was going to smoke her."  The prosecutor then went on to argue that the elements of the crime were satisfied, using details of that specific incident.  Among other things, she argued, "He says I'm going to smoke you.  Pretty sure by anyone's interpretation if you have a gun pressed to the back of your head and your abusive boyfriend tells you he's going to smoke you, it's very clear what that means."[6]

"[W]hen the prosecution has made an election, under circumstances where a unanimity instruction would otherwise have been required, then we, too, are bound by that election.  Thus, if the defendant raises a substantial evidence challenge, our review is limited to whether there is sufficient evidence to support a conviction based exclusively on the act elected by the prosecution." (*Brown, supra*, 11 Cal.App.5th at pp. 341-342.)  Therefore, assuming that the People made an effective election as to the incident forming the basis for count 5, we are required to limit our analysis to the sufficiency of the evidence relating to the incident in which Brugman held a gun to C.'s head and threatened to "smoke" her.

Brugman takes conflicting positions in his appellate briefing as to whether the prosecutor sufficiently informed the jury that the People had elected to base count 5 on the incident in which he held a gun to C.'s head. First, Brugman states that "the prosecutor made clear in closing argument that [she] elected to base this charge on [C.'s] testimony of an incident in which she said [Brugman] placed a gun at her head and told her he was going to 'smoke' her."  According to Brugman, our review of the sufficiency of the

_____

6    The trial court did not give a unanimity instruction.

22

evidence should, therefore "be limited to evidence of that one incident as elected by the prosecution."

However, Brugman also argues that the jury's "not true" finding on the personal use of firearm allegation attached to count 5 (§ 12022.5, subd. (a)) and its not guilty finding for the crime of unauthorized possession of a firearm by a felon in count 6 (§ 29800, subd. (a)(1)), suggests that the prosecutor did not effectively elect between the different incidents that could have formed the basis for the criminal threat charge. Brugman states, "There is [a] question whether the jury understood the prosecutor's election and limited its consideration to the gun incident in reaching its verdict on count 5 since it found [Brugman] not guilty of possession of a firearm, and found the personal use of a firearm allegation to be not true. . . . If it did not, [Brugman's] conviction should be reversed." According to Brugman, because the jury made two findings suggesting that it did not believe that he ever possessed a gun, but it did find Brugman guilty of making a criminal threat in count 5, the jury must not have understood that the prosecutor elected to base count 5 on the incident in which Brugman put a gun to C.'s head. As we will explain, the jury's arguably inconsistent verdicts on the issue of Brugman's gun use do not establish that the prosecutor's election was ineffective to satisfy the requirement that a jury deliver a unanimous verdict.[7]

---

[7] We note that there is one scenario under which the verdicts would not be inconsistent. C. testified the gun was wrapped in a towel and thus not "fully exposed" during the incident. Based on that testimony, the jury could have concluded that Brugman might have fooled C. into thinking that he had a gun underneath the towel, and that he was going to use it to kill her. If the jury believed that Brugman might have been pretending to have a gun under the towel, it could reasonably find that Brugman made a criminal threat, but that he did not possess a firearm.

For one thing, the prosecutor's election could not have been more clear. She twice informed the jury, in simple language, that count 5 was based on the incident in which Brugman held a gun to C.'s head and said he would "smoke" her. Consistently, the only evidence the prosecutor discussed in arguing that the elements of that count were established was the evidence relating to that same incident. This type of direct and clear statement qualifies as an effective election. (*People v. Melhado* (1998) 60 Cal.App.4th 1529, 1539 ["If the prosecution is to communicate an election to the jury, its statement must be made with as much clarity and directness as would a judge in giving instruction."]; *People v. Hawkins* (2002) 98 Cal.App.4th 1428, 1455 [an effective election was made when the prosecutor "repeatedly asserted in argument to the jury" the facts that formed the basis for the count]; *Brown*, *supra*, 11 Cal.App.5th at p. 341 ["The prosecution can make an election by 'tying each specific count to specific criminal acts elicited from the victims' testimony'—typically in opening statement and/or closing argument."].)

Moreover, case law makes clear that a jury's inconsistent verdict or inconsistent findings on an enhancement allegation should not be used on appeal as an indication that the jury did not understand certain aspects of the trial because juries have many reasons for delivering inconsistent verdicts, including "lenity" and "compromise." (*People v. Lewis* (2001) 25 Cal.4th 610, 656 (*Lewis*) ["Nor does the existence of inconsistent verdicts imply that the jury must have been confused. [Citation.] An inconsistency may show no more than jury lenity, compromise, or mistake, none of which undermines the validity of a verdict."].)

Accordingly, we conclude that the prosecutor made an effective election as to the conduct that formed the basis for the charge of making a criminal

threat in count 5. We therefore base our analysis of the sufficiency of the evidence on the incident in which Brugman put a gun to C.'s head and said he would "smoke" her.[8]

### 2. *The Elements of the Crime of Making a Criminal Threat*

To assess the sufficiency of the evidence we review the elements of the crime of making a criminal threat.

As set forth in section 422, subdivision (a): "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished . . . ."

Our Supreme Court has explained that to prove the offense of making a criminal threat under section 422, "[t]he prosecution must prove '(1) that the defendant "willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person," (2) that the defendant made the threat "with the specific intent that the statement . . . is to be taken as a

---

[8]     Because we conclude that the prosecutor effectively communicated to the jury that the People elected to base the charge in count 5 on the incident in which Brugman put a gun to C.'s head, we need not, and do not, address Brugman's alternative contention that the trial court prejudicially erred by not giving an instruction on unanimity in the absence of an election by the People.

threat, even if there is no intent of actually carrying it out," (3) that the threat . . . was "on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat," (4) that the threat actually caused the person threatened "to be in sustained fear for his or her own safety or for his or her immediate family's safety," and (5) that the threatened person's fear was "reasonabl[e]" under the circumstances.' " (*In re George T.* (2004) 33 Cal.4th 620, 630 (*George T.*).) "[A]ll of the surrounding circumstances should be taken into account to determine if a threat falls within the proscription of section 422." (*People v. Solis* (2001) 90 Cal.App.4th 1002, 1013.)

> 3. *The Fact that the Jury May Have Returned Inconsistent Verdicts Does Not Advance Brugman's Contention That Insufficient Evidence Supports His Conviction for Making a Criminal Threat*

Brugman's first approach to attacking the sufficiency of the evidence to support the verdict in count 5 takes aim at two of the required elements of making a criminal threat. Specifically, Brugman contends that insufficient evidence supports a finding on the second element " 'that the defendant made the threat "with the specific intent that the statement . . . is to be taken as a threat" ' " and the third element " 'that the threat . . . was "on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat." ' " (*George T.*, *supra*, 33 Cal.4th at p. 630.)

Brugman bases his argument on the fact that the jury returned verdicts that were arguably inconsistent on the issue of whether Brugman used a gun in threatening C. Specifically, as we have explained, the jury made a "not true" finding on the allegation attached to count 5 that Brugman

26

personally used a firearm in making the criminal threat (§ 12022.5, subd. (a)), and it found Brugman not guilty on count 6, which alleged that, as a felon, he unlawfully possessed a firearm. (§ 29800, subd. (a)(1).) Brugman argues, "Based on its 'not true' finding of the allegation attached to count 5 as well as its not guilty finding on count 6, [Brugman] contends that it is clear the jury had reasonable doubt regarding [C.'s] recount of the incident that [Brugman] had held a gun on her neck and made threatening verbal comments. . . . [S]ince [C.'s] testimony was the only evidence of the criminal threat incident, as charged in count 5, and the jury necessarily did not find her recount of the incident credible, the jury's guilty finding of the substantive offense charged in count 5 cannot be sustained." Brugman interprets the jury's verdict on count 6 and its finding on the firearm allegation in count 5 as establishing that "the jury necessarily found that [Brugman's] angry outburst was not accompanied by the gun [C.] claimed was put to her head."

More specifically, Brugman argues that without the presence of a gun during the incident that the prosecutor elected as constituting the criminal threat, the evidence was insufficient to establish " ' "gravity of purpose and an immediate prospect of execution of the threat," ' " and was also insufficient to show Brugman had the " ' "specific intent" ' " that the statement be taken as a threat. (*George T.*, *supra*, 33 Cal.4th at p. 630.) According to Brugman, "without evidence of the gun use – a fact the jury found not true – the prosecution did not prove beyond a reasonable doubt that [Brugman's] statement was anything more than an angry outburst, made in the heat of an argument."

We reject Brugman's argument because it makes improper use of the jury's verdict in count 6 and the finding on the firearm allegation in count 5.

"It is well settled that, as a general rule, inherently inconsistent verdicts are allowed to stand. [Citations.] The United States Supreme Court has explained: '[A] criminal defendant . . . is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts. This review should not be confused with the problems caused by inconsistent verdicts. Sufficiency-of-the-evidence review involves assessment by the courts of whether the evidence adduced at trial could support *any rational determination of guilty beyond a reasonable doubt.* [Citations.] This review should be *independent* of the jury's determination that evidence on another count was insufficient.' (*United States v. Powell* (1984) 469 U.S. 57, 67.)" (*Lewis, supra,* 25 Cal.4th at p. 656, italics added.) " '[A]ny verdict of guilty that is sufficiently certain is a valid verdict even though the jury's action in returning it was, in a legal sense, inconsistent with its action in returning another verdict of acquittal or guilt of a different offense.' . . . The rule applies equally to inconsistent enhancement findings . . . , and to an enhancement finding that is inconsistent with the verdict on a substantive offense." (*People v. Miranda* (2011) 192 Cal.App.4th 398, 405 (*Miranda*), citations omitted; see also § 954 ["An acquittal of one or more counts shall not be deemed an acquittal of any other count"].)

Thus, in determining whether substantial evidence supports the finding of guilt for count 5, we give no effect to the jury's verdict on count 6 and its finding on the firearm allegation in count 5. Our inquiry is simply whether the evidence presented at trial was sufficient to support a finding that Brugman committed the crime of making a criminal threat. (See, e.g., *Miranda, supra*, 192 Cal.App.4th at p. 407 ["the jury's 'not true' finding on the personal firearm use enhancements may be logically inconsistent with a

28

finding that defendant was the direct perpetrator of the charged offenses, but, by statute [i.e., § 954], the inconsistency is not grounds for reversal because substantial evidence supported the verdict"]; *People v. Price* (2017) 8 Cal.App.5th 409, 452-453 ["In evaluating whether there was sufficient evidence to support the special circumstance finding, we disregard the jury's findings on the personal use allegations and consider all of the evidence presented to the jury regarding [the defendant's] role in the murder, including the evidence indicating [the defendant] was the actual shooter"].)

When we consider the evidence presented at trial, without regard to the jury's other findings, there is ample evidence to support a finding on the second and third elements of the crime of making a criminal threat. C. testified that Brugman held a loaded gun to her head and threatened to "smoke" her, that he said "I'm done with this shit. I'm going to kill you," and that she was "going to go six feet under" and "nobody is ever going to find [your] body." A juror could reasonably conclude that a death threat under those circumstances was " ' "so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat," ' " and was made " ' "with the specific intent that the statement . . . is to be taken as a threat." ' " (*George T., supra*, 33 Cal.4th at p. 630.) The gravity of the threat is especially pronounced because, when Brugman made the threat, he had already engaged in multiple acts of violence against C., including a car crash and punches to her face. (*People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1340 ["the determination whether a defendant intended his words to be taken as a threat, and whether the words were sufficiently unequivocal, unconditional, immediate and specific they conveyed to the victim an immediacy of purpose and immediate prospect of execution of the threat can be based on all the

29

surrounding circumstances," including "[t]he parties' history"]; *People v. Garrett* (1994) 30 Cal.App.4th 962, 967 [when the defendant threatened to put a bullet in his wife's head, "evidence that Wife herself had been a past victim of [his] violence" was relevant to proving that defendant "had the specific intent that his statement . . . would be taken as a threat; that upon hearing the statement, Wife was in a state of sustained fear; and that the nature of the statement was such as to convey an immediate prospect of execution of the threat and to render Wife's fear reasonable"].)  In the context of Brugman's prior acts of domestic violence against C., it is reasonable for a finder of fact to conclude that by pointing a gun at her head and threatening to kill C., Brugman was not merely engaging in "an angry outburst, made in the heat of an argument"  and that, instead, he intended to threaten C. with actual physical harm.

4.	*Substantial Evidence Supports a Finding That C. Experienced Sustained Fear*

Brugman also challenges the sufficiency of the evidence to satisfy the fourth element of the crime of making a criminal threat.  Specifically, he contends that insufficient evidence supports a finding that " 'the threat actually caused the person threatened "to be in sustained fear for his or her own safety or for his or her immediate family's safety." ' "  (*George T.*, *supra*, 33 Cal.4th at p. 630.)

Case law defines "sustained fear" as "a period of time that extends beyond what is momentary, fleeting, or transitory."  (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156 (*Allen*); see also *People v. Fierro* (2010) 180 Cal.App.4th 1342, 1349; *People v. Wilson* (2015) 234 Cal.App.4th 193, 201.) " 'Fifteen minutes of fear . . . is more than sufficient to constitute "sustained" fear for purposes of  . . . section 422.' "  (*Wilson*, at p. 201.)  Indeed, "[w]hen one believes he [or she] is about to die, a minute is longer than 'momentary,

30

fleeting, or transitory.' " (*Fierro*, at p. 1349 [defendant displayed a weapon and stated, "I will kill you . . . right now."].)

Brugman contends that the evidence does not support a finding that C. experienced sustained fear because she continued living with him in the studio, and "there was no evidence that [C.] left the studio apartment immediately or soon after that incident out of fear." We reject the argument.

In arguing that C. did not experience sustained fear, Brugman focuses on the time period *after the gun incident was over*, arguing that C. must not have *continued* to be afraid because she remained with him in the studio. However, that argument is flawed because a victim can experience sustained fear even if the fear exists only during the incident itself, as long as the fear during the incident is more than "momentary, fleeting, or transitory." (*Allen*, *supra*, 33 Cal.App.4th at p. 1156.) As C. testified, she was "scared" during the incident and did not run away during it because she "was afraid." The incident was a drawn-out ordeal, during which, as C. described, Brugman put the gun to her head and threatened to kill her over and over again. "It's like he went in and out of . . . himself and, like, for a second, like, cried, and then the next second he was, like, no, no, no, like fighting with himself. And he was, like, 'No, no, I'm going to kill you.' And he'd put it back up to my head, and then he'd put it down . . . ." A reasonable juror could conclude that while enduring this extended scenario, C. did not merely experience fear that was "momentary, fleeting, or transitory" (*Allen*, at p. 1156), but instead experienced sustained fear.

Moreover, contrary to Brugman's argument, even were we to look to the time period *after* the gun incident ended, the evidence supports a finding that C. continued to be afraid that Brugman would kill her, and thus suffered sustained fear over a long period of time. As C. testified, the reason that she

31

called the police on March 15, 2017, was because she began to believe that if she did not get away from Brugman, she would end up dead in the next few days. Although during the gun incident, C. described Brugman as struggling with being able to go through with killing her, she testified that by the middle of March 2017 when she called the police, "I think he just really lost it, and I could feel it. And he was—he was really ready to make himself go through such a violent crime, such as killing someone." She explained, "[a]t that point it was either going to be that day or it was going to be the day after." This testimony supports a finding that after experiencing the gun incident in February 2017, C. remained afraid that Brugman would go through with his threat to kill her, and she was anticipating that he would act on it when he was mentally able to do so. Although C. continued to live with Brugman, she testified that she did so because she believed his threats that he would hurt her or her family if she left him.

In sum, we conclude that substantial evidence supports a finding that C. experienced sustained fear as a result of Brugman's criminal threat toward her.

D. *The Trial Court Did Not Abuse Its Discretion in Declining to Strike Brugman's Prior Strike or the Enhancement for His Prior Serious Felony*

Brugman's final contention is that the trial court abused its discretion in denying his request to strike his prior strike (§ 667, subds. (b)-(i)) or to strike the five-year enhancement for his serious felony prior (§ 667, subd. (a)(1)).

1. *Procedural Background*

According to the probation officer's report, Brugman's prior strike and prior serious felony are based on a 2015 conviction for assault with a firearm (§ 245, subd. (a)(2)). Specifically, Brugman pointed a gun at his ex-girlfriend

in a threatening manner while driving down the freeway next to her vehicle. Immediately prior to the victim getting into her vehicle, Brugman became angry with her while they argued and stated, " 'Fine. If you feel safe, go' and 'You make me want to get the gun and blow your head off.' "

In his sentencing memorandum, Brugman requested that the trial court either strike his prior strike (§ 667, subds. (b)-(i)), or strike the five-year enhancement for his serious felony prior (§ 667, subd. (a)(1)). The sentencing memorandum attached a letter from C., written in connection with Brugman's sentencing, and a psychological evaluation recently performed on Brugman.

C.'s letter explained at length that she believed she was at least partially responsible for Brugman's conduct toward her because she "played a significant role in his emotional decline" by being "hurtful, manipulative and unfaithful" and that she "senselessly and consistently abused [Brugman] for years." C. also attempted to minimize the significance of Brugman's conduct by stating, among other things, that during the car crash, "I know he did not intend for us to collide," and that when Brugman had sexual intercourse with her while she was unconscious, "I must have given him permission on the night in question, I just don't recall it." C. also explained that Brugman must have assumed she had consented to sexual intercourse while she was unconscious based on some of their previous sexual activity and discussion. Relying on C.'s letter, the sentencing memorandum argued, that "[C.'s] admitted provocation of Mr. Brugman is something the court may properly consider when determining whether to strike the strike prior."

The psychological evaluation commissioned by defense counsel concluded, Brugman "would appear to be afflicted with a severe disorder of personality called Borderline. This is defined as a pervasive pattern of

33

instability in interpersonal relationships beginning by early adulthood and present in a variety of contexts. Individuals with this disorder engage in frantic efforts to avoid real or imagined abandonment. There is a pattern of unstable and intense interpersonal relationships characterized by extremes between love and hate. Impulsivity in areas that are potentially self-damaging is common such as substance abuse, sex, and reckless driving. Emotional instability with intense, yet short lived experiences with depression and anxiety are reported, as is a chronic feeling of emptiness. People with this disorder have difficulty controlling their anger and may have transient paranoid thoughts or brief out of body experiences (called dissociation). Mr. Brugman appears to meet the full criteria for this disorder." The psychological evaluation also noted that Brugman suffered from alcohol and cocaine use disorder. Relying on the psychological evaluation, the sentencing memorandum argued "while it is not being suggested that his psychological diagnosis gives rise to a legal defense, it is something . . . the court may consider when deciding whether to strike the strike."

In sentencing Brugman, the trial court denied the request to strike Brugman's prior strike or to strike the enhancement for Brugman's prior serious felony.

2. *Applicable Legal Standards*

A trial court may dismiss prior felony conviction allegations in cases prosecuted under the Three Strikes law when dismissal is "in furtherance of justice." (§ 1385, subd. (a); see *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497, 529-530.) In deciding whether to dismiss a prior strike, a court considers "whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the

34

particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams* (1998) 17 Cal.4th 148, 161.)

We apply an abuse of discretion standard when reviewing the trial court's refusal to strike a prior strike. (*People v. Carmony* (2004) 33 Cal.4th 367, 375 (*Carmony*).) "[A] trial court will only abuse its discretion in failing to strike a prior felony conviction allegation in limited circumstances. For example, an abuse of discretion occurs where the trial court was not 'aware of its discretion' to dismiss . . . or where the court considered impermissible factors in declining to dismiss," or where " 'the sentencing norms [established by the Three Strikes law may, as a matter of law,] produce [ ] an "arbitrary, capricious or patently absurd" result' under the specific facts of a particular case. . . . [¶] But '[i]t is not enough to show that reasonable people might disagree about whether to strike one or more' prior conviction allegations." (*Id.* at p. 378.) "[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Id.* at p. 377.)

"The trial court is not required to state reasons for declining to exercise its discretion under section 1385" (*People v. Gillispie* (1997) 60 Cal.App.4th 429, 433; see also *In re Large* (2007) 41 Cal.4th 538, 550 (*Large*)), and "is presumed to have considered all of the relevant factors in the absence of an affirmative record to the contrary" (*People v. Myers* (1999) 69 Cal.App.4th 305, 310 (*Myers*)). When, as here, the record is silent as to the trial court's reasons for declining to strike a prior strike, we presume that the trial court " 'correctly applied the law.' " (*Carmony, supra*, 33 Cal.4th at p. 378.) Only

35

in "an extraordinary case—where the relevant factors . . . manifestly support the striking of a prior conviction and no reasonable minds could differ" would "the failure to strike . . . constitute an abuse of discretion." (*Ibid.*)

A trial court also has discretion to strike a five-year enhancement for a prior serious felony conviction under section 667, subdivision (a)(1) when it is in furtherance of justice. (*People v. Garcia* (2018) 28 Cal.App.5th 961, 971 ["Senate Bill 1393 . . . , effective January 1, 2019, amends sections 667[, subd.] (a) and 1385[, subd.] (b) to allow a court to exercise its discretion to strike or dismiss a prior serious felony conviction for sentencing purposes. (Stats. 2018, ch. 1013, §§ 1-2.)"]; *People v. Shaw* (2020) 56 Cal.App.5th 582, 586 [the statutory amendment "give[s] courts power to strike the five-year prior serious felony enhancement 'in the furtherance of justice' "].) Case law and legislative history indicate that courts "must evaluate the nature of the offense and the offender in deciding whether to strike a nickel prior [i.e., a five-year enhancement for a prior serious felony]." (*Shaw*, at p. 586.) As with our review of a decision on a motion to strike a prior strike, "[w]e review a court's decision to deny a motion to strike a five-year prior serious felony enhancement for an abuse of discretion." (*Id.* at p. 587.)

     3.    *The Trial Court Did Not Abuse Its Discretion*

         a.    *Brugman Did Not Rebut the Presumption That the Trial Court Properly Considered All Relevant Factors*

In imposing sentence, the trial court did not give reasons for its decision to refuse Brugman's request to strike his prior strike or strike the enhancement for the prior serious felony. Prior to imposing sentence, the trial court generally commented, "the sentences that I impose I hope are based upon the facts of the case and what I perceive to be the appropriate punishment."

Focusing on the trial court's reference to "the appropriate punishment," Brugman argues, "The court's statement at sentencing suggests that it made its decision, based on the need for *punishment*, without regard for [C.'s] admission supporting [Brugman's] mistaken belief of consent, or giving individualized consideration to substance and mental health issues and [Brugman's] suitability for rehabilitation – which should be an objective for sentencing." Brugman argued that "the court's failure to give adequate weight to these variables was an abuse of discretion." According to Brugman, the trial court improperly "failed to deem his mental health/substance abuse issues and [C.'s] statement as mitigating factors in determining what was in the interest of justice in this case." As a remedy, Brugman contends we should "remand for the trial court to consider his mental illness and [C.'s] statement as mitigating factors, with a view toward including in its decision the sentencing objective of rehabilitation, not just punishment."

In the absence of evidence to the contrary, we presume that the trial court considered all of the relevant factors and properly applied the law. (*Large*, *supra*, 41 Cal.4th at p. 550; *Myers*, *supra*, 69 Cal.App.4th at p. 310; *Carmony*, *supra*, 33 Cal.4th at p. 378.) We reject Brugman's argument because, as we will explain, we find no indication in the record to rebut the presumption that the trial court properly considered all of the relevant factors and evidence—including C.'s letter and Brugman's psychological evaluation—in deciding whether to strike Brugman's prior strike or to strike the enhancement for his prior serious felony.

The trial court's comment that it was basing its sentencing decision "upon the facts of the case and what I perceive to be the appropriate punishment" does not provide evidence that the trial court failed to consider all of the relevant factors and, instead, focused only on the goal of punishing

37

Brugman. The statement was made in the context of responding to certain comments made by Brugman and counsel during the sentencing hearing, not for the purpose of explaining that it *limited* its analysis to focusing on punitive matters. The court stated, "I am not sentencing you because I am upset with you. I have never gotten upset at sentencing ever. It is not a question of getting upset or not; nor do I consider, and would never consider, someone's parole eligibility in fashioning a sentence; nor have I ever, that I can remember, punished a defendant for getting on the stand and lying about certain things that did or did not take place. [¶] *The sentencing or the sentences that I impose I hope are based upon the facts of the case and what I perceive to be the appropriate punishment*." (Italics added.)

Moreover, although Brugman contends that the trial court failed to take into account the psychological evaluation, the record indicates to the contrary. Immediately before pronouncing sentence, the trial court specifically focused on the psychological evaluation, stating "I have a longstanding history with [the psychologist who conducted the evaluation] and I value her opinion. She has submitted reports to me on any number of cases over the last 30 years."[9]

In sum, we reject Brugman's contention that the trial court abused its discretion by failing to conduct a proper analysis of the factors and evidence relevant to whether it should strike Brugman's prior strike or prior serious felony enhancement.

---

[9] In addition, at the outset of the sentencing hearing, the trial court stated that it had read and considered the sentencing statement filed by the defense. Both the psychological evaluation and C.'s letter were attached to that sentencing statement.

b. *The Trial Court's Refusal to Strike the Prior Strike or the Five-Year Enhancement Was Not So Irrational or Arbitrary That No Reasonable Person Could Agree with It*

The record in this case amply supports a determination that Brugman was not "outside the . . . spirit, in whole or in part" of the Three Strikes Law (*People v. Williams, supra,* 17 Cal.4th at p. 161) and that it would also not be in the "furtherance of justice" to strike the enhancement for Brugman's prior serious felony. (§ 1385, subd. (a).)

As we have explained, the offense constituting Brugman's prior strike and prior serious felony was committed in 2015, and, like the offenses at issue in this case, it involved an incident of domestic violence against another romantic partner during an argument. Further, like more than one of the offenses in the instant case, the 2015 offense specifically involved a threat made with a firearm and the use of a motor vehicle in perpetrating domestic violence. Brugman had a criminal history prior to the 2015 offense, starting in 2007 when, as a juvenile, he committed an aggravated assault in a stabbing incident. Then, in 2014, Brugman obtained a felony conviction for concealed possession of a loaded firearm in his vehicle. The instant offenses, against two different victims, occurred in 2016 and 2017, and thus followed close on the heels of Brugman's prior offenses, which occurred in 2007, 2014, and 2015.

A court denying a motion to strike may reasonably focus on the fact that the prior strike was recently committed. (*People v. Strong* (2001) 87 Cal.App.4th 328, 346 [a defendant with "only a recent violent assault, soon followed by another felony while still on parole, surely, . . . would come within both the letter and the spirit of the Three Strikes law"].) Further, "the circumstances must be 'extraordinary . . . by which a career criminal can be deemed to fall outside the spirit of the very scheme within which he squarely

39

falls once he commits a strike as part of a long and continuous criminal record, the continuation of which the law was meant to attack.' " (*Carmony*, *supra*, 33 Cal.4th at p. 378.)  Due to his continuous history of criminal conduct, Brugman "appears to be 'an exemplar of the "revolving door" career criminal to whom the Three Strikes law is addressed.' " (*Id.* at p. 379.)

In light of Brugman's criminal history, the conclusion that Brugman does not lie outside of the spirit of the Three Strikes law and that it would not be in furtherance of justice to strike the five-year enhancement for his prior serious felony is not "so irrational or arbitrary that no reasonable person could agree with it." (*Carmony, supra*, 33 Cal.4th at p. 377.) Brugman thus has not established that the trial court abused its discretion.

## DISPOSITION

The judgment is affirmed.


IRION, J.

WE CONCUR:


O'ROURKE, Acting P. J.


AARON, J.