Filed 5/17/24  P. v. Tooks CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B322885 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. NA114939 |
| v. | |
| OTIE TOOKS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, James D. Otto, Judge.  Affirmed and remanded with instructions.

Susan S. Bauguess, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill, Supervising Deputy Attorney General, and David F. Glassman, Deputy Attorney General, for Plaintiff and Respondent.

_____

Otie Tooks appeals his conviction for willful, deliberate, and premeditated attempted murder and criminal threats, arguing substantial evidence supports neither.  He also argues his case must be remanded to allow the trial court to exercise its discretion and consider imposing a lesser enhancement under section 12022.53.  We affirm, but remand for the trial court to amend its July 7, 2022 minute order to reflect its oral pronouncement striking Tooks's prior strike convictions.  Citations are to the Penal Code.

I

We recount the factual and procedural background in the light favorable to the verdict.

Virginia Saldonid and Justin Sauer lived in an RV parked on Paramount Boulevard in Long Beach.  A woman Sauer helped with her car introduced Saldonid and Sauer to Tooks who was also living in an RV parked on the same street.  Sauer and Saldonid knew Tooks as "Nut" or "Nut Nut."  Sauer helped Tooks by moving his RV across the street a few times to avoid street sweeping because Tooks's RV was not running.  Sauer had two generators, one that worked well and one that did not.  Eventually, Sauer told Tooks he could plug into Sauer's "good" generator if he helped by putting gas into the generator.

Saldonid and Sauer were on friendly terms with Tooks during this time.  Tooks would bring extra food over to their RV.  Sauer hung out with him a few times.  Saldonid said she saw Tooks every day, though she rarely spoke to him.

One night in July 2020, after Sauer and Saldonid had known Tooks for about four to six weeks, Tooks's RV was on the opposite side of the street from theirs, at a slight diagonal.  The good generator was connected to Tooks's RV.  At about 2 a.m.,

Sauer grew annoyed with the poor performance of the other generator and decided to take the good generator back. He went across the street and knocked on the door to Tooks's RV. Tooks did not want Sauer to take the generator back because he had just put gas in it and was using it. Sauer told him it was his generator, and he was taking it. He told Tooks he would pay him for the gas. At trial, Sauer testified he took the generator, and Tooks punched him in the mouth. Sauer took the generator across the street and put it in the back of his truck and then returned to his own RV where he told Saldonid what had happened.

Saldonid testified she awoke from a nightmare about 3 a.m. and realized Sauer was not in the RV. She went outside and saw Sauer running down the street and bleeding from his forehead. He told Saldonid what had happened. Tooks and Sauer continued yelling at each other across the street from their respective RVs. Tooks yelled that he was calling his homeboys, that they were on their way, and to just wait until they got there. Tooks had his phone in his hand. Saldonid testified that she was terrified; she did not know what Tooks was going to do, but he was very angry and she was terrified for both herself and Sauer.

Sauer told Saldonid to get gas and take it and money to Tooks and offer them to him. Saldonid did so. She testified that she was desperately trying to defuse the situation. Tooks told her to "shut the fuck up, bitch." She kept saying she was sorry and asked him to take the gas or the money, but Tooks refused. He was very angry. He said, "If you want to get stupid, then you will get harmed too."

Saldonid returned to the RV where Sauer was waiting. She told Sauer she wanted to leave because she believed gang

members were coming, but Sauer did not want to give up the generator.  Sauer told Saldonid to park her car a distance behind their RV so she could watch it while he went to call the police.

Saldonid did as Sauer said.  After a while, she saw a white SUV pull up, and Tooks got in the front passenger side door.  The SUV stopped across the street from Saldonid's car, and Tooks got out.  Tooks approached the passenger side of Saldonid's car carrying something squarish in his hand.  He said, "Don't back up, bitch.  Don't you move."  Saldonid was terrified and could not get her car in gear.  Saldonid finally got her car in drive and as she did, Tooks shot the passenger side door of her car.  Saldonid drove down Paramount toward the police station.

Sauer in the meantime had started toward the gas station and realized he did not have any money.  He instead drove to the nearby RV of their friends Michelle Weeden and Johnny to use their phone.  He entered their RV, sat on a couch against a wall across from the door, told them what was happening, and asked for a cigarette.  Sergio, a mutual acquaintance, then came to the door and told them about his brother getting killed the night before.  Sergio asked Sauer when he was going to fix his generator.

Sauer then heard someone yell, "Get the fuck out of the way!"  He recognized it as Tooks's voice, though he could not initially see him because he was behind Sergio.  Tooks entered the RV and shot Sauer four times from about three feet away.  The bullets hit Sauer's arm, leg, and lower torso.  Tooks fled the RV and got back in the white SUV.

Sauer went to his truck, not believing he had time to wait for an ambulance.  He could not get the keys in the ignition, however, and asked Sergio to drive him.  Sergio called 911 on the

4

way, and Sauer exclaimed on the call that his neighbor shot him. Sergio drove Sauer to a hospital down the road, though he needed to be transferred to another hospital where he spent nine days.

When Saldonid did not see Sauer at the gas station she kept driving, planning to go to the police station farther down the road. She saw the white SUV behind her. When she saw the white SUV turn off, she believed they had seen Sauer or his truck, so she made a U-turn and followed. When she caught up to the white SUV, it was double-parked next to Sauer's truck outside their friends' RV. Saldonid heard four gunshots and a woman scream. She saw Tooks run out of the RV and get in the passenger side front door of the white SUV, which drove off. Saldonid then drove back to the gas station and called 911 to report that Sauer had been shot by their neighbor, "Nut." While she was on the phone with the 911 operator, she saw Sauer's truck drive by.

Officers responded to the gas station where Saldonid was, the hospital, the locations of the shootings, and Tooks's RV. At the gas station, officers spoke to Saldonid who said Sauer had gotten into an altercation with their neighbor, "Nut" or "Nut Nut" and gave a description of him and his RV. The police ran the plates of his RV and it came back as belonging to Otie Tooks. Officers found mail belonging to Tooks inside the RV.

An officer unconnected to the investigation showed Saldonid a six-pack containing Tooks's picture in the number three slot. At first, Saldonid said she did not see the shooter. The officer then asked if she saw anyone related to the crime. Saldonid confirmed she did not, but said number three looked closest. The officer asked why she said that. Saldonid replied

something about the roundness of his head, but again confirmed she did not see the shooter.  At the officer's prompting, Saldonid then wrote a statement that she was sure the other five were not the shooter, but the eyes and shape of the head of number three were similar to the shooter's.  The officer then asked how sure she was number three was involved, and Saldonid said she was not absolutely sure, but she was sure the other five were not the shooter.

Another officer unconnected to the investigation showed Sauer the same six-pack several weeks later once he was out of the hospital.  Sauer stated it was more difficult than he thought to identify someone.  He pointed at a few of the pictures.  The officer told him to focus on the eyes and the nose.  When Sauer indicated he thought the person in number three was too fat, the officer responded he seemed more medium and reminded Sauer the pictures might not look exactly the same as the person and that weight can change.  The officer told Sauer to take his time and that he did not need to have a hundred percent confidence level.  Eventually, Sauer selected the person in slot number three, saying "I hope I'm doing the right thing" and that he was "pretty sure."  The detective asked if his confidence level was high several times, and Sauer responded variously, "It's one of the two, but I think it's him," "I think so," and "Uh-huh."  The detective wrote on the form that the person in number three was the person that shot the victim and that Sauer's confidence level was high.

Saldonid later sent one of the detectives a photo she found on Facebook of the person she knew as Nut.  She also sent the detective a photo of a magazine cover showing an address label that Nut had given Sauer in her presence.  She told the police

6

that Sauer thought he saw Tooks 40 to 50 times a day, and she had to reassure him it was not Tooks. Saldonid and Sauer moved out of state after the shooting.

At the preliminary hearing and at trial both Saldonid and Sauer identified Tooks in court as the shooter.

At trial, the jury convicted Tooks of the willful, deliberate, and premeditated attempted murder of Sauer and found true that he personally inflicted great bodily injury on Sauer, personally used a handgun, personally and intentionally discharged a handgun, and personally and intentionally discharged a handgun causing great bodily injury to Sauer, under section 12022.53, subdivisions (a), (b), (c), and (d). The jury also convicted Tooks of making criminal threats to Saldonid. In a bifurcated bench proceeding, the judge found Tooks had three convictions constituting prior strikes.

At sentencing, the trial court struck the enhancement for the prior strikes and imposed the mid-term sentence on the willful, deliberate, and premeditated attempted murder and criminal threat charges, with those sentences to run concurrently. The trial court added 25 years for the firearm enhancement under subsection (d), noting that he would likely not have struck the prior strikes enhancement if he were not imposing the firearm enhancement. In total, the trial court sentenced Tooks to 32 years to life in state prison.

Tooks appeals.

## II

Tooks argues substantial evidence does not support his willful, deliberate, and premeditated attempted murder or criminal threats convictions. He further argues the trial court was unaware of and therefore did not properly exercise its

7

discretion to strike his firearm enhancement and impose a lower sentence. Finally, he argues the July 7, 2022 minute order incorrectly states that court stayed rather than struck the prior strikes enhancement. Only his final argument has merit. We affirm but remand with directions for the trial court to amend its July 7, 2022 minute order to reflect its oral pronouncement striking the prior strikes enhancement.

A

Tooks argues that substantial evidence did not support the identification of him as the shooter. He is mistaken.

In undertaking to review the record for substantial evidence, we review the record as a whole, considering the evidence and the inferences to be drawn in the light most favorable to the verdict. (*People v. Manibusan* (2013) 58 Cal.4th 40, 87 (*Manibusan*).) We determine neither credibility issues nor evidentiary conflicts. (*Ibid*.)

Tooks claims Saldonid's and Sauer's out-of-court identifications were so weak as to constitute insufficient evidence. He emphasizes how long each took to select his picture from the six-pack and points to what he says is evidence of steering by the administering officers. He points to his expert's evidence that if it takes longer than 25 seconds to make an identification, the identifier is not recognizing, but finding the best match as well as the expert's testimony about administrator and post-event influence. However, the jury heard all of the evidence and was able to weigh it. Moreover, Saldonid's and Sauer's six-pack identifications were not the only evidence that went towards the identification of Tooks as the shooter. Saldonid and Sauer each identified Tooks to police that night, they each heard his voice, they identified Tooks in court, and Tooks was in

an altercation with Sauer earlier in the evening.  The jury and we are able to consider all of the evidence in determining if the prosecutor met her burden.

Tooks argues there were many discrepancies and reasons not to believe the accounts Saldonid and Sauer gave of the events of that night.  He points to how far away Tooks was from Saldonid when he got into the white SUV.  He points out that at one point Sauer said the shooter was five foot six inches to five foot eight inches, when Tooks is six foot two inches.  He states that Sauer was high that night.  He points out that despite seeing Tooks every day for weeks, neither Saldonid nor Sauer were able to immediately pick him out of the six-pack.

Defense counsel made all of these arguments to the jury.  It is not our role to reweigh the credibility of the witnesses or determine how we would decide the case.  (*Manibusan*, *supra*, 58 Cal.4th at p. 87.)

Substantial evidence supported the jury's conviction.

B

Tooks argues substantial evidence did not support his conviction of criminal threats to Saldonid because he did not threaten her.

The five elements of a criminal threat are: 1) the defendant willfully threatened to commit a crime that would result in death or great bodily injury to another person; 2) the defendant specifically intended that the statement be taken as a threat even if the defendant did not intend to carry it out; 3) the threat was, on its face and under the circumstances under which it was made, so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat; 4) the threat

9

actually caused the person threatened to be in sustained fear for his or her own safety or his or her immediate family's safety; and 5) the threatened person's fear was reasonable under the circumstances. (*In re George T.* (2004) 33 Cal.4th 620, 630.)

We again apply substantial evidence review. (*Manibusan*, *supra*, 58 Cal.4th at p. 87.)

The prosecutor argued the jurors could convict Tooks if they all agreed he had threatened her during either of two interactions. The first was when Saldonid went over to Tooks's RV to offer him money or gas and he told her to "shut the fuck up, bitch," that he had called his homeboys, and that if she wanted to get stupid, she would get harmed, too. The second was when Tooks approached Saldonid in her car and said, "Don't back up, bitch. Don't you move."

Tooks argues the first interaction did not constitute a criminal threat. He points out that Saldonid testified she "didn't know what that meant" that he had called his homeboys and "really didn't think anything. [She] didn't know what it was." Saldonid did use these words in testifying, but the rest of her testimony made clear she believed men were coming to beat up or kill her and Sauer and she feared for their lives. She may not have known exactly what Tooks meant, but she got the gist and was terrified. Tooks further argues the threat was not immediate, but Saldonid took it as such. She begged Sauer to leave the area.

Tooks next argues his statement that if Saldonid wanted to get stupid she would get harmed too was too conditional to be a threat. Accepting Tooks's argument as true for purposes of this discussion, this statement still qualifies as a criminal threat against Saldonid. For purposes of a criminal threat, immediate

10

family includes a person who regularly lives in the threatened person's household. (CALCRIM No. 1300.) Even if the threat was conditional as to Saldonid, it was not as to Sauer, who was a member of Saldonid's household. Therefore, the jury could properly rely on this statement in convicting Tooks of a criminal threat against Saldonid.

Tooks also faults Saldonid for not remembering this threat until prompted by the prosecutor. Saldonid admitted on the stand she was nervous about testifying and was doing so two years after the event. The jury was free to take into account her lapse of memory in judging her credibility.

Tooks argues the second interaction did not constitute a threat because his words did not threaten physical harm. However, he spoke as he approached with gun in hand. Then he used the gun to shoot at Saldonid's car. The jury could consider this potent context. (*People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1341 [words to be interpreted in light of surrounding circumstances].)

Substantial evidence supported the jury's conviction on this count.

C

Tooks argues the trial court was unaware of its discretion to impose a lesser firearm enhancement under section 12022.53 and therefore could not have exercised its discretion properly. This argument is meritless.

Tooks points to *People v. Tirado* (2022) 12 Cal.5th 688, in which the Supreme Court resolved a split among the Courts of Appeal, holding a trial court may impose a lesser uncharged firearm enhancement that has been proved. (*Id.* at pp. 694, 697, 700.) The Supreme Court decided *Tirado* five months before

11

sentencing in this case, and neither the court nor the parties mentioned it. Tooks argues, therefore, the trial court was unlikely unaware of this new authority.

As the prosecutor notes, however, *Tirado* is inapplicable. Here, there were not uncharged lesser firearm charges. The prosecutor had charged the lesser enhancements, and they had all been found true. Thus, there is no reason to think the court was unaware of its discretion to impose a lesser enhancement. And, given the court's comment that it would likely not have stricken the prior strikes enhancement if it were not imposing the firearm enhancement, it seems the trial court thought this was a proper enhancement. We see no reason to remand under these circumstances.

D

Finally, Tooks argues the July 7, 2022 minute order states that the trial court stayed the prior strikes enhancement though the transcript reflects that the court struck it. The prosecutor agrees the minute order should be amended. So do we. We remand with instructions for the trial court to do so.

**DISPOSITION**

We affirm the judgment and remand for the trial court to amend its July 7, 2022 minute order to reflect that the court struck the prior strikes enhancement.



WILEY, J.

We concur:



GRIMES, Acting P. J.        VIRAMONTES, J.



12